No. 12,753.

GEORGE L'HOTE vs. CITY OF NEW ORLEANS ET ALS.

SYLLABUS.

The city of New Orleans has the power to assign the limits beyond which houses of prostitution shall not be permitted; an ordinance of that character merely asserts the municipal functions to secure public order, decency and morals, and violates none of the guarantees of the rights of person and property contained in the federal and State Constitutions. City Charter, Act No. 45 of 1896, S. 15; the similar provision in previous charters: Black's Constitutional Law, p. 301; 1st Dillon Municipal Corporation. S. 310.

ON APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*E. Howard McCaleb, E. Howard McCaleb, Jr.,* and *Rene C. Metoyer* for L'Hote, Plaintiff, and Appellee, and for Church Extension Society of the Methodist Episcopal Church, Intervenor and Appellant.

*James J. McLoughlin,* Assistant City Attorney, and *Samuel L. Gilmore,* City Attorney, for City of New Orleans and Superintendent of Police, Defendants, Appellants.

Argued and submitted April 20, 1898.
Opinion handed down November 21, 1898.
Rehearing refused January 9, 1899.

The opinion of the court was delivered by

MILLER, J.    The defendant's appeal from the judgment maintaining the injunction restraining the enforcement of the ordinance of the common council changing the limits beyond which lewd women are prohibited from residing.

From an early period it has been the policy of the councils of the city to assign limits for houses of prostitution by prohibiting, under prescribed penalties, the location of such houses beyond the designated limits.    The ordinance, earliest in date on this subject, to which our attention has been directed, was passed in 1857.    There were changes in the limits in subsequent years, and the last ordinance which gave rise to the present controversy prescribed the south side of Customhouse street to the north side of St. Louis, and from Basin to the lower side of Robertson street as the limits beyond which houses of prostitution were prohibited.    This, as we understand it, extended the permitted limits of previous ordinances so as to include St. Louis street from which such houses had been excluded by the ordinance passed shortly preceding that the city is now seeking to enforce.    This last ordinance restricts the limit assigned to these houses by the previous ordinances by substituting "between Basin and Robertson streets," for the more enlarged space comprised between the river in

front and the rear of the city designated by earlier ordinances, although St. Louis street is embraced in the last ordinance, not in the ordinance immediately preceding the last enactment. It is claimed that St. Louis street never was within the space assigned for these houses; we derive a different impression, but whether or not included in the earlier ordinances, can exert no appreciable influence on our decision.

The plaintiff, a property owner, and a resident on Treme street, intersecting St. Louis street, and half a square from St. Louis street, alleges in his petition for the injunction, the close proximity of his dwelling to that portion of St. Louis street brought within the area in which houses of prostitution are to be allowed by the ordinance he proposes to enjoin; that his locality has been and is free from such houses; that their introduction is calculated to render his property unfit for his family dwelling and greatly depreciates its value; that the ordinance excludes a large portion of the area in which houses of prostitution were previously permitted, at the same time enlarging the limits so as to embrace St. Louis street; that the city, by the previous ordinance designating the limits and excluding St. Louis street, had exhausted the legislative power in respect to the subject, and the petition charges that the ordinance is oppressive, unjust and violative of the protection to persons and property accorded by the Constitution of the United States and of the State. There is an intervention by a religious corporation, owning and maintaining a church near St. Louis street, between Robertson and Villere streets, and another intervention by another property owner in the same neighborhood; the allegations in the petitions of intervention present the subject in a different phase, and allege the injury to property within the designated area, arising from confining houses of prostitution as proposed by the ordinance. Thus the theory of the plaintiff's petition is that the city has no power to change the limits of houses of prostitution; the position of the intervenors is, there should be no limits for such houses.

The city and the officials sought to be restrained by the injunction, except to the jurisdiction of the Civil District Court, on the ground that the injunction sought is directed against the enforcement of a penal statute; that the petition discloses no cause of action, and, on other grounds unnecessary to notice. The judgment maintained the injunction and this appeal followed.

It is clear that the Civil District Court has no jurisdiction to restrain prosecutions for crime confided by the law to the criminal courts. No prevention of such prosecutions is attempted. The plaintiff seeks the injunction for the protection of his rights of property, menaced, as he conceives, by an illegal ordinance. The right of the citizen to that protection, is too clear to permit dispute, and, in our view, the petition contains all that is essential to secure relief at our hands, if the allegations in the petition are supported. 1st High on Injunction, S. 68.

The regulation of houses of prostitution would seem to be so closely connected with public order and decency; the policy announced by the ordinance has been so long exerted in all large cities of our country; and the power has had such frequent recognition in the charters of this city, that it would seem the power itself cannot be successfully controverted. City Charter of 1870, S. 12; of 1882, S. 8; of 1896, S. 15. We have, however, given careful attention to the argument that urges objection to all such legislation and which directs attention to the grounds of opposition deemed specially applicable to the ordinance, the execution of which is sought to be arrested.

That there are limitations to the power asserted by this ordinance may be conceded. It does not, however, readily occur to the mind that confining houses of this character, within certain limits by the appropriate ordinance, is violative of any of the constitutional guarantees invoked in this discussion before us. The ordinance neither sanctions nor undertakes to punish vice. The power to punish vice not in the form of an offence, denied by the argument and enforced by the authorities we find in the briefs, is, in our view, entirely distinct from the function the ordinance asserts as belonging to municipal government by the express terms of the city charter. It is urged, too, the ordinance is a license for vice, and, hence, illegal. Tiedeman on Police Power, p. 291. Undoubtedly, the court should refuse its aid to any ordinance, if of the character asserted by the argument. The vice, the subject of this ordinance beyond the reach of penal statutes, is simply subjected by this ordinance to that restraint demanded by the public interest. The unfortunate class dealt with by the ordinance must live; they are not denied shelter, but assigned that portion of the city beyond which they are not permitted to establish their houses. Thus viewed, the ordinance cannot be deemed open to the

objections that it either punishes or grants a license to vice beyond
the competency of the council.

Again, it is urged that the ordinance is oppressive, unreasonable,.
and hence, not to be enforced, because it seeks to confine the depraved.
women in too narrow limits. We find the testimony of this tendency
in the record. If the ordinance is lawful this question of space is,.
in our opinion, confided to the council, and not for the courts. At.
any rate, we find no basis in the record to authorize the conclusion
that the judgment of the council on this question, is erroneous...
There is the general proposition asserted by the argument that the
correct policy is to diffuse the houses throughout the city, although the·
anticipated presence of the houses, within half a square of the plain-
tiff's residence, and though on a different street, prompted this suit
and vigorous opposition of the plaintiff. We cannot accept the view
of public policy announced by the argument for the plaintiff, and, on.
that ground, set aside the action of the council.

The argument is advanced that houses once used for immoral uses,.
the subject of the ordinance, can never regain a reputable character;.
that the primary ordinance of this character gave the neighborhood.
it designated, and to the property within its limits, an ineffaceable:
stigma, depreciating for all time the value of the property, and hence·
it is argued that this first concession of private right for the public·
good is enough; that is the first exercise of power by the council is.
exhaustive of its power over the subject. The character of the houses.
within the limits first assigned, fixed forever, it is hence contended
the limits cannot be changed, least of all extended, involving as it.
would, a fresh and unnecessary sacrifice of private right. The effect.
of the argument, while conceding the function of municipal govern-
ment to assign limits for such houses, is to affirm that this important.
municipal function once exerted, can never be again exercised. The·
limits, we are told, must remain as originally fixed, irrespective ·of all·
those changes and public needs apt to arise, and to demand modifica-
tion of limits, assigned years previously, for uses admitting of no sup-
pression, but which can be restricted as to locality. It seems to us if·
the functions asserted by the ordinance can be once exerted as the·
argument concedes, the more reasonable conclusion is that the func-·
tion may again be called into exercise, to meet the changed conditions·
time has called into existence, and which appeal for appro-
priate action to the municipal authorities. We cannot, therefore, as--

sent to the proposition, that because limits for these houses were as-
signed, perhaps more than three-quarters of a century ago, therefore
the council cannot furnish in 1896, the legislation demanded by the
public interest.

There remains the argument addressed to us varied in form, but
maintaining the general proposition that the ordinance operates to
deprive the citizen of his property; that is, to depreciate its value the
same as deprivation in legal effect.  We can readily appreciate there
might be an arbitrary exercise of this power that would warrant an
appeal to the courts.  Thus, to extend these limits so as to embrace
without an apparent reason, if reason could exist, portions of the city
always devoted to private residences, schools, churches and other law-
ful uses, might well be deemed oppressive and an abuse of the power
of municipal government; but as we understand this ordinance, in its
main features it is restrictive, that is, confines these houses within
narrower bounds.  True, it takes in St. Louis street, or, as we believe,
one side of the street excluded by the ordinance immediately preced-
ing that now sought to be enforced.  If it be true that St. Louis
street, that is, both sides of it, were always without the area in which
these houses were permitted, it is none the less true that St. Louis
street has alwas been in close proximity to the space allotted to houses
of prostitution.  An extension of these limits, so as to take in that
street, or rather that portion of it always alongside of the area for
those houses, and at the same time greatly diminishing that area as
previously delineated, does not strike us as arbitrary, or as calling for
any substantial sacrifice of private rights beyond that required by
antecedent ordinances.  To whatever extent, however, the right of
private property may be deemed affected by this last ordinance, it
must be borne in mind that it is their great power of government
given to preserve the morals, health and lives of the community that
requires the surrender of right by the citizen supposed to be exacted
by this ordinance.  To that police power all must yield obedience.  As
put in the text books and enforced by all decisions: "Every citizen
holds his property subject to the proper exercise of the police power
exerted either by the legislature or by the subordinate political corpor-
ations.  It is settled that police laws and regulations, though they
may disturb the enjoyment of individual rights, are not unconstitu-
tional.  They do not expropriate property for public use.  If the in-
dividual sustains injury it is deemed *damnum absque injuria,* or, in

the theory of the law, the injury to the owner is deemed compensated by the public benefit the regulation is designed to subserve." 1st Dillon Municipal Corporations, p. 93. It is our conclusion, on every aspect of the case, that the ordinance is the exercise of lawful power, Black's Constitutional Law, p. 301. Dwarris on Statutes, p. 455. and no ground exists to enjoin the execution of that which the ordinance proposes. 1st Dillon, S. 310.

It is therefore ordered, adjudged and decreed that the judgment of the lower court in favor of plaintiff, be reversed, and the injunction obtained by plaintiff issued be dissolved, his suit be dismissed, and that the judgment of the lower court, dismissing the interventions, and dissolving the injunction granted on the prayer of one of them be affirmed and that plaintiff pay costs.

The CHIEF JUSTICE did not sign the judgment, not being satisfied as to its correctness.

MR. JUSTICE BLANCHARD concurs in the judgment also, for reasons assigned from the bench.

NOTE--Taken to United States Supreme Court by writ of error.