177 U.S. 587
 20 S.Ct. 788
 44 L.Ed. 899
 GEORGE L'HOTE and the Church Extension Society of the Methodist Episcopal Church, Plffs. in Err.,
v.
CITY OFNE W ORLEANS et al.
 No. 204.
 Argued March 20, 1900.
 Decided May 14, 1900.
 
 By ordinance No. 13,032, council series, approved January 29th, 1897, it was ordained by the common council of the city of New Orleans:
 'That from the first of October, 1897, it shall be unlawful for any public prostitute or woman notoriously abandoned to lewdness to occupy, inhabit, live, or sleep in any house, room, or closet, situated without the following limits: South side of Custom House street from Basin to Robertson street, east side of Robertson street from Custom House to St. Louis street, south side of St. Louis street from Robertson to Basin street. Provided, That no lewd woman shall be permitted to occupy a house, room, or closet on St. Louis street. Provided further, That nothing herein shall be so construed as to authorize any lewd woman to occupy a house, room, or closet in any portion of the city. § 2. That it shall be unlawful for any person or persons, whether agent or owner, to rent, lease, or hire any house, building, or room to any woman or girl notoriously abandoned to lewdness or for immoral purposes outside the limits specified in section 1 of this ordinance. § 3. That public prostitutes or notoriously lewd and abandoned women are forbidden to stand upon the sidewalks in front of or near the premises they may occupy, or at the alleyway, door, or gate of such premises, or to occupy the steps thereof, or to accost, call, or stop any person passing by, or to walk up and down the sidewalks, or to walk up the city streets indecently attired, or in other respects so as to behave in public as to occasion scandal, or disturb and offend the peace and good morals of the people. § 4. That it shall not be lawful for any lewd women to frequent any cabaret or coffee house or bar room and to diink therein. § 5. That it shall be unlawful for any party or parties to establish or carry on a house of prostitution or assignation without the limits specified in section—of this ordinance. § 6. That wherever a house of prostitution or assignation within or without the limits established by this ordinance may become dangerous to public morals, either from the manner in which it is conducted or the character of the neighborhood in which it is situated, the mayor may, on such facts coming to his knowledge, order the occupants of such house, building, or room to remove therefrom within a delay of five days, by service of notice on such occupants in person, or by posting the notice on the door of the house, building, or room, to remove therefrom within a delay of five days, and upon such occupants failing to do so, each shall be punished as provided in section—of this ordinance. § 7. That in the event that the occupants of such house, building, or room referred to in section 6 do not remove therefrom after the infliction of the penalty, the mayor is authorized to close the same and to place a policeman at the door of such premises to warn away all such parties who shall undertake to enter. § 8. That any person or persons who shall violate the provisions of this ordinance, or who shall disturb the tranquilluty of the neighborhood or commit a breach of the peace, shall be punished by the recorder having jurisdiction, for the first offense by a fine not exceeding $5, and in default of payment by imprisonment not exceeding ten for the second offense by a fine not exceeding $10, and in default of payment by imprisonment not exceeding twenty days, and for any subsequent offense by a fine not exceeding $25, and indefault of payment by imprisonment not exceeding thirty days. § 9. That each day any person or persons shall continue to violate the provisions of this ordinance shall constitute a sepaat e offense. § 10. That on and from the day this ordinance takes effect all ordinances in conflict therewith be and the same are hereby repealed, provided that nothing herein contained shall affect ordinance 12,456, C. S., relative to prostitutes in the fifth district.'
 By ordinance No. 13,485, council series of the city of New Orleans, approved July 7th, 1897, it was ordained: 'That section 1 of ordinance 13,032, C. S., be and the same is hereby amended as follows: From and after the 1st of October, 1897, it shall be unlawful for any public prostitute or woman notoriously abandoned to lewdness to occupy, inhabit, live, or sleep in any house, room, or closet situate without the following limits, viz.: 1. From the south side of Custom House street to the north side of St. Louis street, and from the lower or wood side of North Basin street to the lower or wood side of Robertson street. 2. And from the upper side of Perdido street to the lower side of Gravier street, and from the river side of Franklin street to the lower or wood side of Locust street, provided that nothing, herein shall be so construed as to authorize any lewd woman to occupy a house, room, or closet in any portion of the city. Be it further ordained, That section 1 of ordinance 13,032, C. S., as amended above, be and the same is hereby re-enacted.'
 The above ordinance being in force, the plaintiff in error George L'Hote, a resident, citizen, and taxpayer of New Orleans, brought this action in the civil district court for the parish of Orleans against the city of New Orleans, its mayor and superintendent of police, on behalf of himself and all other persons similarly situated, who might intervene and bear their proportion of costs and expenses. The object of the suit was to obtain a decree enjoining and prohibiting the defendants from in any manner enforcing ordinance No. 13,032 as amended by section 1 of ordinance No. 13,485.
 The bill alleged that the plaintiff was the owner of property situated in the square bounded by St. Louis, Franklin, Treme, and Toulouse streets in the second district of the city of New Orleans, and resided with his wife and children in that square at No. 522 Treme street; that the chief and principal way of approach to his residence, and for ingress and egress thereto, was in, through, and from St. Louis street; that the locality in which he resided was, at the commencement of the action, and had always been, used for private residences, schools, groceries, and other mercantile establishments; that the people residing in that locality were then and had always been moral, virtuous, sober, law-abiding, and peaceful; that the locality referred to was not then and never had been dedicated to immoral purposes or used for dwelling places and as the refuge of public prostitutes, lewd and abandoned women and the necessary attendants thereof, drunkards, idle, vicious, and disorderly persons, who gather around them to gratify their depraved appetites, and who were regarded as dangerous to the peace and welfare of the community, their presence at any place being always a just cause of alarm and apprehension;
 That the above ordinances were unconstitutional, illegal, unreasonable, and oppressive, and would, if executed, work irreparable injury, wrong, and damage to the plaintiff;
 That the council in enacting those ordinances pretended to have acted under and by virtue of the power conferred upon them in § 15 of act No. 45, approved July 7th, 1896, 'to regulate the police of houses of prostitution and assignation and to close such houses in certain limits, and shall have the power to exclude the same, and to authorize the mayor and police to close said places;' and
 That the enforcement of those ordinances in the manner provided for violated the provisions both of the Constitution of the United States and of the state, and would deprive the plaintiff of his property without due process of law, and amount to a taking or damaging of such property for public purposes without jst and adequate compensation being first paid.
 The bill further alleged that 'the introduction of public prostitutes, women notoriously abandoned to lewdness, in said locality, authorizing them to occupy, inhabit, live, and sleep in houses and rooms situated therein, will materially lessen and depreciate the value of your petitioner's property, render his dwelling and the dwelling of his neighbors similarly situated unfit for the occupancy of private families, destroy the morals, peace, and good order of the neighborhood, drive out and turn away the lawabiding, virtuous citizens and their families from said locality, and dedicate the same to public and private nuisances per se, contrary to law and good morals;'
 That 'the common council of the city of New Orleans had previously designated the limits within which prostitutes and women notoriously abandoned to lewdness should inhabit and live, and had thereby exhausted whatever power was vested in them by legislature of the stae and were without legal right to alter, change, or modify the same to the injury, detriment, and damage of your petitioner and others residing in said locality, which said council have attempted to include within said limits; that, having so exhausted the authority conferred upon them by the legislature, the said council was without power to capriciously change the limits previously established by them; that the avocations plied by public prostitutes and women notoriously abandoned to lewdness are contra bonos mores, and the said common council of the city of New Orleans have no right, power, or authority to legalize the same and to permit such persons to reside in the said vicinity in which your petitioner and others dwell with their families;'
 That 'there was no good and sufficient reason for the enactment of said ordinance or the changing of the limits previously existing and established;'
 That 'said council, in enacting said ordinance No. 13,485, council series, eliminated and excluded a large area of the city which had been previously dedicated to the occupancy of lewd and abandoned women, to the detriment and injury of petitioner, by changing said limits so as to include St. Louis street in his locality;'
 That the execution of the ordinances would render plaintiff's dwelling house and those of his neighbors unfit and unsuitable for the occupancy of their families, wives, and children, and wholly valueless for the purposes for which they were constructed and had theretofore been used; and
 That the plaintiff and others similarly situated would be compelled, if the ordinances were executed, to abandon and remove from their dwellings at great trouble, expense, and annoyance, and that the enforcement of the ordinance would oppress, injure, and seriously damage and incommode the plaintiff and all others similarly situated.
 The plaintiff also averred that the ordinances if executed would deprive him and others similarly situated of the equal protection of the laws and be in violation equally of the Constitution and laws of the United States and of the state; that, under the laws and ordinances of the city as they existed, he and all others similarly situated in the locality had the right to cause houses of prostitution and assignation suppressed as nuisances per se and the innates arrested and forced to vacate and remove therefrom, and of that right the plaintiff had theretofore availed himself; and that the ordinances if executed would legalize such nuisance and take away the rights of citizens theretofore existing and vested in plaintiff and others residing in that locality.
 After alleging that the enforcement of the ordinance would work irreparable damage and injury to him in the depreciation in value of his property, because it would cease to be a fit and proper place for the dwelling house of himself, his wife, and children, and necessitate their abandonment of the same and removal from the locality, he prayed that the ordinances might be dela red null and void.
 The writ of injunction as prayed was directed to be issued.
 The city of New Orleans, its mayor and superintendent of police, pleaded that the court was without jurisdiction ratione materioe.
 Bernardo Gonzales Carbajal intervened by petition, and after alleging that he was the owner of certain improved property within the limits prescribed by the above ordinances, reiterated all the allegations of the petition of L'Hote so far as they related to his property, and averred that the enforcement of the ordinances would work great and irreparable injury to him and depreciate his property by rendering it unfit and unsuitable for dwelling houses. He united in the prayer that the ordinances be declared null and void.
 The Church Extension Society of the Methodist Episcopal Church, a corporation chartered and organized under the laws of Pennsylvania, also intervened, and alleged that it was the owner of buildings and improvements within the above district which were used and occupied for church purposes; that a religious congregation known as the Union Chapel of the Methodist Episcopal Church assembled and worshipped therein on each and every Sabbath and on Tuesday and Friday evenings, as well as on other stated occasions; that besides the religious services conducted in that church a Sunday school was organized and established which was attended by 170 children, who received religious instruction and teaching, and that the membership of that congregation consisted of about 300 persons, while those worshiping in the church numbered about 600 persons.
 The society reiterated all the allegations of the plaintiff's petition and alleged that if the ordinances were enforced the value of its property would be destroyed and the same would be unfit for the purposes for which it was erected and was now being used, enjoyed, and occupied; that the threats to enforce the ordinances had already caused a portion of the congregation attending the church to cease from attending therein; that, encouraged by the action of the city council of New Orleans in passing the ordinances, a number of lewd and abandoned women had already taken up their abode and habitation in the vicinity of the church and were plying their vocation as prostitutes; and that a number of houses were then in progress of erection and construction which were intended to be used and kept as brothels and houses of prostitution, and other places had been leased and let for the purpose of carrying on liquor saloons and concert halls, for the purpose and with the intention of changing the hitherto respectable character of that neighborhood into a resort for vice and the establishment of nuisances mala in se.
 After averring that the above ordinances were in violation of the Constitution of the United States and the Constitution and laws of Louisiana, and that the city council had no right to destroy the value of the intervener's property and render the neighborhood in which the same was located the resort of lewd and abandoned women, it united in the prayer of the plaintiff's petition that those ordinances be declared null and void.
 The exceptions filed by the defendants to the petitions of the plaintiff and the interveners having been overruled, the city of New Orleans and its chief of poliec filed an answer averring that the ordinances in question were legal and that their enforcement would be a lawful exercise of the power conferred upon the city, and especially a valid exercise of the power conferred upon it by act No. 45 of 1896.
 The civil district court rendered judgment in favor of the plaintiff, but in favor of the city against the interveners. From that judgment suspensive appeals were allowed and prosecuted by the city as well as by the Church Extension Society.
 By the final judgment of the supreme court of Louisiana the judgment of the civil district court in favor of the plaintiff was reversed, and the injunction obtained by him was dissolved and his suit dismissed, while the judgment dismissing the intervening petitions and dissolving the injunction granted on behalf of the interveners was affirmed. 51 La. Ann. 93, 44 L. R. A. 90, 24 So. 608.
 Mr. E. H. McCaleb for plaintiffs in error.
 Messrs. J. J. McLoughlin, Samuel L. Gilmore, and Branch K. Miller for defendants in error.
 Mr. Justice Brewer delivered the opinion of the court:
 
 
 1
 The question presented in this case is whether an ordinance of the city of New Orleans prescribing limits in that city, outside of which no woman of lewd character shall dwell, operates to deprive these plaintiffs in error of any right secured by the Constitution of the United States. It is well, in the first place, to look at the negative side and see what is not involved. No woman of that character is challenging its validity; there is no complaint by her that she is deprived of any personal rights, either as to the control of her life or the selection of an abiding place. She is not saying that she is denied the right to select a home where she may desire, or that her personal conduct is in any way interfered with. In brief, the persons named in the ordinance, and against whom its provisions are directed, do not question its validity.
 
 
 2
 In the second place, no person owning buildings outside of the prescribed limits is complaining that he is deprived of a possible tenant by virtue of the ordinance, or saying that the abridgment of her freedom of domicil operates to cut down the amount of his rents.
 
 
 3
 In the third place, it will be perceived that the ordinance does not attempt to give to persons of such character license to carry on their business in any way they see fit, or Indeed, to carry it on at all, or to conduct themselves in such a manner as to disturb the public peace within the prescribed limits. Clauses 3 and 4 of the first section of the ordinance are clearly designed to restrain any public manifestation of the vocation which these persons pursue, and to keep so far as possible unseen from public gaze the character of their lives, while clauses 6, 7, 8 and 9 provide means for enforcing order and preventing disturbances of the peace.
 
 
 4
 The question, therefore, is simply whether one who may own or occupy property in or adjacent to the prescribed limits, whether occupied as a residence or for other purposes, can prevent the enforcement of such an ordinance on the ground that by it his rights under the Federal Constitution are invaded.
 
 
 5
 In this respect we premise by saying that one of the difficult social problems of the day is what shall be done in respect to those vocations which minister to and feed upon human weaknesses, appetites, and passions. The management of these vocations comes directly within the scope of what is known as the police power. They affect directly the public health and morals. Their management becomes a matter of growing importance, especially in our larger cities, where from the very density of population the things which minister to vice tend to increase and multiply. It has been often said that the police power was not by the Federal Constitution transferred to the nation, but was reserved to the states, and that upon them rests the duty of so exercising it as to protect the public health and morals. While, of course, that power cannot be exercised by the states in any way to infringe upon the powers expressly granted to Congress, yet until there is some invasion of congressional power or of private rights secured by the Constitution of the United States, the action of the states in this respect is beyond question in the courts of the nation. In Barbier v. Connolly, 113 U. S. 27, 31, 28 L. ed. 923, 924, 5 Sup. Ct. Rep. 357, 359, it was said:
 
 
 6
 'But neither the amendment—broad and comprehensive as it is nor any other amendment was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people.'
 
 
 7
 See also Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 24 L. ED. 527; Boston Beer Co. v. Massachusetts, 97 U. S. 25, 24 L. ed. 989; Patterson v. Ketu cky, 97 U. S. 501, 24 L. ed. 1115; Northwestern Fertilizing Co. v. Hyde Park, 97 U. S. 659, 24 L. ed. 1036; Plumley v. Massachusetts, 155 U. S. 461, 39 L. ed. 223, 15 Sup. Ct. Rep. 154, and cases in the opinion.
 
 
 8
 Obviously, the regulation of houses of ill fame, legislation in respect to women of loose character, may involve one of three possibilities: First, absolute prohibition; second, full freedom in respect to place, coupled with rules of conduct; or, third, a restriction of the location of such houses to certain defined limits. Whatever course of conduct the legislature may adopt is in a general way conclusive upon all courts, state or Federal. It is no part of the judicial function to determine the wisdom or folly of a regulation by the legislative body in respect to matters of a police nature.
 
 
 9
 Now, this ordinance neither prohibits absolutely nor gives entire freedom to the vocation of these women. It attempts to confine their domicil, their lives, to certain territorial limits. Upon what ground shall it be adjudged that such restriction is unjustifiable; that it is an unwarranted exercise of the police power? Is the power to control and regulate limited only as to the matter of territory? May that not be one of the wisest and safest methods of dealing with the problem? At any rate, can the power to so regulate be denied? But given the power to limit the vocation of these persons to certain localities, and no one can question the legality of the location. The power to prescribe a limitation carries with it the power to discriminate against one citizen and in favor of another. Some must suffer by the establishment of any territorial boundaries. We do not question what is so earnestly said by counsel for plaintiffs in error in respect to the disagreeable results from the neighborhood of such houses and people; but if the power to prescribe territorial limits exists, the courts cannot say that the limits shall be other than those the legislative body prescribes. If these limits hurt the present plaintiffs in error, other limits would hurt others. But clearly the inquiry as to the reasonableness or propriety of the limits is a matter for legislative consideration, and cannot become the basis of judicial action. The ordinance is an attempt to protect a part of the citizens from the unpleasant consequences of such neighbors. Because the legislative body is unable to protect all, must it be denied the power to protect any?
 
 
 10
 It is said that this operates to depreciate the pecuniary value of the property belonging to the plaintiffs in error, but a similar result would follow if other limits were prescribed, and therefore the power to prescribe limits could never be exercised, because, whatever the limits, it might operate to the pecuniary disadvantage of some property holders.
 
 
 11
 The truth is, that the exercise of the police power often works pecuniary injury, but the settled rule of this court is that the mere fact of pecuniary injury does not warrant the overthrow of legislation of a police character.
 
 
 12
 Among the cases in which this question has been presented may be noticed Northwestern Fertilizing Co. v. Hyde Park, 97 U. S. 659, 24 L. ed. 1036, and Mugler v. Kansas, 123 U. S. 623, 31 L. ed. 205, 8 Sup. Ct. Rep. 273. In the first of these cases an act of the general assembly of the state of Illinois had authorized the fertilizing company to establish a plant for the purpose of converting dead animals into an agricultural fertilizer. In pursuance of this authority the company had built its factory outside the then limits of the city of Chicago and in a territory adjacent to which there was no population. As the years rolled by population gathered around the factory, and the character of the work carried on was such as to make it a nuisance to the neighborhood. The village of Hyde Park, which had grown up around the works of the company, passed an ordinance to suppress these works, and a bill was filed in the state court to restrain the enforcement of that ordinance. The supreme court of the state held the ordinance valid, and on error to this court that judgment was affirmed. Although there was a charter right to maintain these works, and although when established they were located in a territory in which there was no population, yet when population had gathered around them the police power of the state was held sufficient to stop their existence, and that without compensation to the owner. The pecuniary injury which directly resulted to the company from the stoppage of its works was held no bar to the police power of the state. In the other case Mugler had established a brewery in Kansas, when such an institution was authorized by the laws of the state. The buildings and machinery were of little value except for the purpose of manufacturing beer. Yet when Kansas, in the exercise of its police power, determined that the manufacture of beer should cease, it was ruled by this court that the pecuniary loss to Mugler did not justify any restraint of the legislative acts prohibiting the manufacture of beer. Each individual holds his property subject to the ordinary and reasonable exercise of the police power, and the fact that its exercise may in a particular case work pecuniary injury was adjudged insufficient to stay the legislative action. It is true those cases involved pecuniary injury to the persons whose action was prohibited, but it cannot be that the police power of a state can be stayed because it works injury to one person, and not stayed if it works injury to another.
 
 
 13
 In 1 Dill. Mun. Corp. 4th ed. § 141, the rule is thus stated:
 
 
 14
 'Laws and ordinances relating to the comfort, health, convenience, good order, and general welfare of the inhabitants are comprehensively styled 'Police Laws or Regulations.' It is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury it is either damnum absque injuria, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. The citizen owns his property absolutely, it is true; it cannot be taken from him for any private use whatever, without his consent, nor can it be taken for any public use without compensation; still he owns it subject to this restriction, namely, that it must be so used as not unreasonably to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally.'
 
 
 15
 The learned author, in these and accompanying sentences, is discussing the rule when legislative action operates directly upon the property of the complainant and where injuries alleged to result are the direct consequence of legislative action. If under such circumstances the individual has no cause of action, a fortiori must the same be true when the injuries are not direct but consequential, when his property is not directly touched by the legislative action but is affected in only an incidental and consequential way. Here the ordinance in no manner touched the property of the plaintiffs. It subjected that property to no burden, it cast no duty or restraint upon it, and only in an indirect way can it be said that its pecuniary value was affected by this ordinance. Who can say in advance that in proximity to their property any houses of the character indicated will be established, or that any persons of loose character will find near by a home? They may go to the other end on the named district. All that can be said is that by narrowing the limits within which such houses and people must be, the greater the probability of their near locatin. Even if any such establishment should be located in proximity, there is nothing in the ordinance to deny the ordinary right of the individual to restrain a private nuisance. Under these circumstances we are of the opinion that the ordinance in question is not one of which the plaintiffs in error can complain. The judgment of the Supreme Court of Louisiana is therefore affirmed.