(79 South. 542)

No. 22884.

OSBORN v. CITY OF SHREVEPORT.

(May 27, 1918. Rehearing Denied June 29, 1918.)

*(Syllabus by the Court.)*

1. INJUNCTION ☞114(2)—RIGHT OF ACTION—ENFORCEMENT OF ORDINANCE.

An agreement containing features of a promise of sale, an option to purchase, and a lease, but which is not a sale, of a residence on a residential street within the limits of a municipal corporation, conveys no such property right to the grantee as will entitle him to an injunction restraining the municipal authorities from prosecuting him for carrying on an undertaking business, upon such street, in violation of an ordinance prohibiting the same.

2. MUNICIPAL CORPORATIONS ☞613—REGULATION OF BUSINESS—PROHIBITING UNDERTAKING ESTABLISHMENT ON RESIDENCE STREET—ORDINANCE.

The authority conferred upon a municipal corporation to prevent and prohibit the location, construction, or maintenance of all buildings and all establishments where any nauseous or unwholesome business may be carried on, and to restrict the same within certain limits, includes the authority to prohibit the establishment and maintenance of an undertaking business on a residential street where such business has not theretofore been conducted.

3. MUNICIPAL CORPORATIONS ☞620—USE OF PROPERTY—UNDERTAKING ESTABLISHMENT—RESIDENCE DISTRICT.

In the absence of any prohibitive ordinance, an undertaker may be prevented, agreeably to the maxim, "Sic utere tuo ut alienum non lædas," from establishing his business among residences where such business has not theretofore been conducted.

*(Additional Syllabus by Editorial Staff.)*

4. COURTS ☞475(1)—JURISDICTION OF CRIMINAL COURT—OUSTER BY ORDER OF CIVIL COURT.

A criminal court actually in the exercise of its constitutional jurisdiction cannot be ousted thereof by an order of a civil court possessing no supervisory control over it.

5. INJUNCTION ☞105(1) — PROHIBITION OF CRIMINAL PROCEEDINGS.

Before a criminal or a civil court is seised of jurisdiction of a case involving both an offense and a property right, possessor of property right invaded by enforcement of penal ordinance may appeal to tribunal having jurisdiction to prohibit adverse litigant from taking it to criminal court.

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Suit for injunction by Roll Osborn against the City of Shreveport. Judgment for plaintiff, and defendant appeals. Judgment reversed, injunction dissolved, and suit dismissed.

Lewell C. Butler, City Atty., of Shreveport, for appellant. Levy & Crane and Alexander & Wilkinson, all of Shreveport, for appellee.

## Statement of the Case.

MONROE, C. J. An ordinance of the city of Shreveport (No. 27 of 1915) declares it unlawful "to maintain or operate any undertaking shop or parlor, where bodies are embalmed, kept, or prepared for interment, except on the business streets of the city." It then names, or designates by localities, the business streets and sections and declares that all others are residential. The petition herein, filed in September, 1917, alleges that, on August 20th of that year, plaintiff had entered into a contract * * * to purchase the Logan residence on Christian street in the residential section of the city, for $18,500, of which $500 were paid in cash, and the contract, made part of the petition, purports to show an agreement whereby he is to pay the balance in 87 monthly installments (86 of them for $208.33 each) or, say, $2,500 per annum; to have right of entry upon the premises in December, 1917, and make the first payment on January 1, 1918; to make certain changes therein, at his own expense; to keep the property insured and deliver the policies to the "vendor"; to have the right to a deed upon paying one-half of the purchase price, provided the interest, taxes, and insurance premiums shall have been paid and all other conditions complied with; the vendor, thereafter, to retain a mortgage and lien for the balance; whereby, should the vendee default in the performance of any of the terms agreed on, or alter the property contrary thereto, the vendor, at his option, may declare the contract forfeited and retain all payments made, "as liquidated damages and as rent," and all improvements placed thereon; default, after execution of deed, to mature all payments; and vendee to take reasonable care of property and bear expense of repairs. It appears to have been the intention to execute the instrument in the form of a notarial act, as its recitals begin, "Be it known that, before me, Sidney N. Cook, a notary public," etc.; but it bears neither notarial signature nor seal, nor date, save the year 1917 nor does it appear to have been witnessed or registered. There is, however, an admission concerning it to which we will refer a little later. The petition further alleges that plaintiff is an undertaker, conducting one of the largest establishments of that kind in Shreveport, on Texas street (within the business area), and that he has made the purchase in question with the intention of removing and permanently establishing that business on the premises so acquired; that, after making known his intention, he received a communication from the commissioner of public safety, advising him that, if he carried it into effect, he would be arrested and prosecuted under the Ordinance No. 27 of 1915; that the ordinance is void, because ultra vires of the city; and should the court hold that the city charter purports to convey such authority, is unconstitutional, in that it is "unreasonable, unjust, discriminatory, partial and in contravention of common right," invades plaintiff's property rights and deprives him of his property without due process of law; and it prays for an injunction, prohibiting the city authorities from arresting and prosecuting petitioner or otherwise enforcing the ordinance, and for judgment decreeing it to be void. A preliminary injunction was issued, after which

the city filed an exception to the jurisdiction of the court ratione materiæ, on the ground that the civil remedy of injunction cannot be used to oust the jurisdiction of the criminal court of prosecutions under the ordinance. The exception having been overruled, the city answered, and the case went to trial on the merits and upon certain admissions and oral testimony, to wit: It was admitted that plaintiff purchased the residence on a residential street upon the date and for the purpose alleged; that he was then, and had been for years, conducting his business on a business street; and that he received the notice that, if he established it on the premises alleged to have been acquired by him, he would be prosecuted under the ordinance. It was further admitted that two sanitariums and a hospital, grocery stores, livery stables, laundries, blacksmith shops, garages, restaurants, fruit stands, etc., are already established on residential streets; that hotels, where families reside, and a telephone exchange, in which 60 young women are employed, are established on business streets; and that undertaking establishments are permitted on residential streets in New Orleans, Denver, St. Louis, Cleveland, Dallas, and many other cities in the United States. Seven witnesses were called for the plaintiff and none for defendant. Plaintiff, himself (as one of the witnesses called on his behalf), gave the following, with other, testimony:

On his examination in chief:

"Q. Mr. Osborn, I believe that you testified in this case, when it was first up, did you not? A. Yes, sir. Q. In the opinion of the court in this case, the court quoted from your testimony which I will read to you: 'In embalming shops, are any offensive odors ever emitted, when a body is being embalmed? A. No, sir; not after a body is embalmed. Sometimes we have quite a time getting the smell of the disease off, and when we are getting out the gases and getting the smell of disease off, they are not so sweet. Q. Is there any difference in operating on a live patient and on a dead patient, so far as the odor is concerned? A. I don't know; I guess some of those dead bodies are not very sweet and there is an odor. Q. Would that odor be obnoxious? A. I don't know; sometimes it makes it offensive to us until we can get them under control, and I would think, if the neighbors were where they could smell it, or very close at the time, that they would not enjoy it. I have lived over undertakers' shops all my life, and I haven't minded it.'

"Q. Now, with reference to that testimony, did you mean to convey the idea to the court that there were odors around the undertaking shop? A. No, sir. Q. I wish you would explain to the court how long it is before you have gotten a dead body under control, after it is brought into the undertaking shop, irrespective of what its condition is? A. Well, it is a great deal owing to the body; some bodies are very much decomposed and, of course, it takes longer than an ordinary body. For instance, we get a floater; but, oftener, we get to work, it takes five or ten minutes. * * * Q. Now, then, during the year, is it frequent or infrequent to get bodies decomposed in the morgue? A. Very infrequent. Q. How often? A. I have been where I am at seven years, and I have not had except two or three bodies in very bad condition. * * * Q. If the doors and windows were open, the odors would escape from the room? A. Perhaps they would, but we do not let them get out; we kill them. Q. You endeavor to do that? A. Yes, sir. Q. You would not swear you could absolutely prevent the odors from escaping? A. No, sir."

No questions were asked him concerning his contract for the purchase of the residence, and all that we find upon that subject is the admission that he had made the purchase, and the instrument by private signature, evidencing an agreement as above stated.

Of the other witnesses who were examined, two were undertakers or embalmers. One witness gave the following testimony, when examined in chief:

"Q. During the time that you have lived here, have you ever lived near an undertaking establishment? A. Not until I lived at Osborn's. Q. How long have you lived there? A. About four years, I think. Q. You did live next to Roll Osborn's undertaking establishment? A. Yes, sir; for three years."

The inference that we draw is that the witness was a member of either plaintiff's domestic or business establishment, or both. She testifies that she observed no noxious odors. Another witness is a florist, and another an iceman, both of whom have had

(by reason of their businesses, no doubt) frequent occasion to visit plaintiff's establishment. The florist lived for a year, with his family, over an undertaking shop, and suffered no inconvenience from it, though, being asked whether there were no unpleasant odors coming from it, at times, replied, "At times, there were, the same as in any other business." And he further testifies as follows (the question first asked being whether the odors would not be noticeable and objectionable), to wit:

"It depends upon how close you came to it. I have been in undertaking establishments * * * when they would bring in a corpse that had been in the water several days in the summer, when the odor was very objectionable; but how it would affect different people I do not know. * * * The odor, I do not mind, but I do not know what my neighbor would do. Q. I will ask you if you have not, in your experience, heard neighbors complain about such matters as that? A. I don't know that you could call it complaint, but I'll tell you what I have heard. I have heard people say that they would not live next to an undertaker's establishment; but, of course, that is from a sentimental standpoint; but I am taking the proposition that I would not object to it."

The iceman gave the following, with other, testimony:

"Q. Have you had occasion to go into an undertaker's shop when they brought in bodies decomposed? A. I have been to Osborn's probably a hundred times. Q. Have you not, on some occasions, noticed in their building odors that were disagreeable, from these dead bodies? A. I can't say that I have."

At another time he testifies that he had been a butcher (before he became an iceman), and that he had lived next to plaintiff's place for more than three years; that he did not suffer from obnoxious odors emanating from the place, and was not otherwise inconvenienced; that it was just like living anywhere else, to him; and the same as to his family.

A young lady operator in a telephone exchange, where there are 60 ladies employed and next door to which (in the business part of the city) is an undertaker's shop, testifies that she has not been inconvenienced by it and has heard no complaint from the others.

One of the embalmers gave the following, with other, testimony:

"Q. You think that you can get the odor from a corpse under control in 10 or 15 minutes, no matter how bad? A. Not all of them; there may be some that I could not get under control in 10 or 15 minutes, but the majority I could. Q. Have to be an extremely bad case that you could not get under control in 10 or 15 minutes? A. Yes, sir. * * * Q. You said that, in some cases, you could not get the odor under control in 10 or 15 minutes? A. Perhaps I might, and then again I might not. Q. Might take longer? A. Yes, sir. * * * Q. During the time that you were getting it under control, it would be bad? A. I expect it would."

The testimony of the other embalmer (and undertakers) is slightly more favorable to the view that there is nothing unpleasant in that business.

### Opinion.

The objection which first suggests itself, to the issuance, by our civil courts, of injunctions prohibiting prosecutions in the criminal courts, is that our written law does not so provide; but, to the contrary, the Constitution itself declares that prosecutions shall be by indictment or information, or (under statute) by affidavit, and it provides for the courts in which they shall be conducted, and confers upon the civil courts no authority to interfere with the exercise of that jurisdiction. In the other states the writ of injunction is a remedy which is afforded by their systems of equity—"systems of jurisprudence, separate, but incomplete, which are administered side by side with the common law, supplementing the latter where it is deficient, in places, overlapping, and there usually prevailing against the common law." 16 Cyc. 1, 2, note 5. The different Constitutions of Louisiana have uniformly, and in specific terms, prohibited the introduction into this state of any system or Code of laws by general reference thereto, and the prohibition has always been understood as leveled at the com-

mon-law and equity systems prevailing in the other states and in England. Hence the sole basis for the exercise by our courts of equity jurisdiction is to be found in the provisions of article 21 of the Civil Code, reading:

"In all civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."

As, however, the same Constitution and laws which confer upon some of our courts jurisdiction in the matter of the prosecution of crimes and offenses confer upon others jurisdiction in the matter of the protection of property rights, and as the line between the two jurisdictions is not defined in cases where crimes or offenses are confused with property rights, it has been held, not that a court exercising civil jurisdiction will assume to prohibit a court vested with criminal jurisdiction from exercising the same, but that, where rights of property are threatened with invasion by prosecutions under unconstitutional or invalid statutes or ordinances, individuals and officers, from whom such threats proceed, may be enjoined from attempting to execute them, and that, in the absence of express law conferring that authority upon the civil courts, they may appeal to "natural law and reason and received usages," including the practice in the courts of equity in this country and England. Le Blanc v. City, 138 La. 272, 273, 70 South. 212. Turning then to the usages recognized in the courts of equity in this country, we find that, in an exhaustive opinion, handed down in 1887, the Supreme Court of the United States, in considering an application for habeas corpus, by certain municipal officers, imprisoned for contempt committed in disregarding an injunction issued by a Circuit Court of the United States, prohibiting them from further proceeding in the matter of the impeach-

ment of a police judge, defined the jurisdiction of a court of equity as follows:

"The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property, it has no jurisdiction over the prosecution, the punishment or the pardon of crimes, or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, is to invade the domain of the courts of common law, or of the executive and administrative department of the government." Ex parte Sawyer, 124 U. S. 200, 8 Sup. Ct. 482, 31 L. Ed. 402.

The doctrine sustained for a long time by this court is thus stated in Levy & Co. v. Shreveport, 27 La. Ann. 620 (being an appeal from a judgment enjoining defendant from prosecuting plaintiff under a city ordinance), to wit:

"Defendants excepted to the action on the ground that the petition disclosed no good cause for the suit and no proper showing is made for the issuance of the injunction. We think this exception should have been sustained. In order to present the question whether the mayor had authority to arrest and fine the defendants for carrying on a private market in contravention of the ordinances of the city of Shreveport, and the question whether said ordinances are legal, the defendants should have appealed from the judgments imposing the penalty in said ordinances prescribed. They cannot test the authority of the mayor to enforce the ordinances of the city of Shreveport prohibiting private markets, * * * in a proceeding of this kind."

That doctrine was affirmed in many cases, some of which are cited in the opinion in Le Blanc v. City, supra.

In 1899, in the case of L'Hote v. City, 51 La. Ann. 96, 24 South. 608, 44 L. R. A. 90, this court maintained the right of the plaintiff to an injunction restraining the enforcement of a certain penal ordinance converting into a "red light" district a section of the city of New Orleans in which he owned and occupied a residence; the penalties of the ordinance having been leveled at others than himself, and he having no opportunity, actual or prospective, to test its validity upon the

trial of any prosecution. The language used by the court in dealing with the question of jurisdiction was as follows:

"It is clear that the civil district court has no jurisdiction to restrain prosecutions for crime confided by law to the criminal courts. No prevention of such prosecutions is attempted. The plaintiff seeks the injunction for the protection of his rights of property, menaced, as he conceives, by an illegal ordinance. The right of the citizen to that protection is too clear to permit dispute, and, in our view, the petition contains all that is essential to secure relief at our hands, if the allegations in the petition are supported. 1 High on Injunctions, § 68."

The suit was, however, dismissed, on the ground that the ordinance was valid, and that ruling was affirmed by the Supreme Court of the United States (177 U. S. 587, 20 Sup. Ct. 788, 44 L. Ed. 899).

A few years later, in Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 23 Sup. Ct. 498, 47 L. Ed. 778, it appeared that plaintiffs were subcontractors, engaged in the erection of gas works, for Mrs. Dobbins, on a tract of land in Los Angeles, upon which, under an existing ordinance, such works could lawfully be erected, and by virtue of a permit from the proper department of the city government, when the city council passed an amendatory ordinance excluding said land from the territory within which the works were permitted and prohibiting the erection of the same thereon, under penalty, after which the city authorities caused petitioners' employés to be arrested and prosecuted for violating the prohibition by continuing their work; wherefore, an injunction was prayed for, restraining the prosecutions, but the bill was dismissed by the Circuit Court, apparently on the ground that a court of chancery has no power to restrain criminal proceedings, unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there.

On the appeal to the Supreme Court, that august tribunal considered the question of jurisdiction, to some extent, but, expressing no conclusion concerning it, affirmed the judgment appealed from, on the ground that plaintiffs, being merely subcontractors, presumably, had an action at law against the contractor, and showed no legal interest in the litigation.

In Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169, the plaintiff was the lady whose name appeared in the suit brought by Davis & Farnum Manufacturing Company, and her suit was founded on the same cause of action, and, like the other, was dismissed on demurrer; but, having been taken to the Supreme Court of the United States (by writ of error to the Supreme Court of California), it was there decided that the enactment of the amendatory ordinance by the city council of Los Angeles was not a competent exercise of the police power, and that, taking the allegations of plaintiff's bill to be true, she had the right to proceed with the work without interference by the city authorities in the form of arrest and prosecution of those in her employ.

It is to be inferred that plaintiff herself was not threatened with prosecution, under the amendatory ordinance, and the questions whether she could have found an adequate remedy against such prosecution in the criminal court, and whether, that being the case, she was entitled to an injunction, staying the prosecutions, were not considered in the body of the opinion; all that is said upon that subject being found in the closing paragraph, which reads as follows:

"It is well settled that, where property rights will be destroyed, unlawful interference, by criminal proceedings, under a void law or ordinance, may be reached and controlled by a decree of a court of equity. Davis & F. Mfg. Co. v. Los Angeles, 189 U. S. 207–218, 23 Sup. Ct. 498, 47 L. Ed. 778–780, and cases there cited."

It was accordingly held that the demurrer should have been overruled and the city

put upon its answer, and the case was remanded for further proceedings not in conflict with the opinion.

In N. O. Baseball & Co. v. City of New Orleans, 118 La. 228, 42 South. 784, 7 L. R. A. (N. S.) 1014, 118 Am. St. Rep. 366, 10 Ann. Cas. 757, it appeared that plaintiff had purchased for $10,000, a square of ground within corporate limits, and which was lawfully available for its purposes, with the intention of operating a baseball park, and that the city council thereafter adopted an ordinance declaring the operation of such parks unlawful within a territory including the square so purchased, and prescribing a penalty therefor; whereupon, plaintiff obtained a preliminary injunction from the civil district court prohibiting the enforcement of the ordinance, and defendant applied to this court for a writ of prohibition, alleging that the civil district court was without jurisdiction to issue the writ. It was here held, however, on the authority of the L'Hote and Dobbins Cases, that, taking the allegations of the petition to be true, the ordinance was personal, arbitrary, and discriminatory, and showed injury to property rights resulting from its enactment, and that a proper case for the issuance of an injunction was disclosed. ·

In Le Blanc v. City of New Orleans, 138 La. 243, 70 South. 212 (supra), plaintiffs (two in number) applied for an injunction against the enforcement of what is known as the "jitney ordinance," attacking it as unconstitutional, unreasonable, discriminatory, etc., and alleging that one of the two was being prosecuted under it, in the recorder's court. To which the city excepted that the court was without jurisdiction and that the petition disclosed no cause of action. The preliminary injunction was, however, issued, and application made to this court for prohibition, which was granted; it being held that the petition disclosed no invasion of a property right, and hence that it was immaterial whether the ordinance was valid or invalid, or whether an adequate remedy could be found in the courts vested with jurisdiction to enforce it.

In Patout Bros. v. Mayor, etc., of New Iberia, 138 La. 697, 70 South. 616, this court maintained an injunction against the threatened enforcement of an ordinance making it unlawful for any one to "begin, erect, maintain," etc., a livery stable in the residential part of the city, without first obtaining the consent of a majority of the persons owning property within 300 feet of the site or proposed site of such stable and a permit from the city trustees; the facts being that plaintiffs were operating their stable and proposed to enlarge it, when they were threatened with prosecution under the ordinance, whereupon they brought suit alleging that the ordinance was void, because, at the time of its adoption, the city was without authority to regulate stables or fix the limits within which they might be conducted. It does not clearly appear from the opinion whether plaintiffs were in business prior to the adoption of the ordinance or not; but, from the statement that the ordinance had been in existence long before they sought to enlarge the stable, we infer that, in its original shape, it pre-existed the ordinance. However that may be, it was held that the ordinance was unauthorized; that plaintiffs had a property right in which they were entitled to protection; and that the injunction was the proper remedy.

[4, 5] We find nothing in the cited cases which authorizes the conclusion that a criminal court, actually in the exercise of its constitutional jurisdiction, can be ousted of that jurisdiction by the order of a civil court possessing no supervisory control over the other. The most that can be said is that, before either court is seised of jurisdiction, quoad a particular case, involving both an

offense and a right of property, the question of the jurisdiction is an open one; and that, where a municipal ordinance, carrying a penalty is adopted, is believed to be unauthorized and illegal, and its enforcement will destroy or invade a property right, it is open to the possessor of the right to appeal to the tribunal vested with jurisdiction of such matters for protection, and, pending the disposition of the question so presented, that tribunal may protect its jurisdiction by prohibiting the adverse litigant from carrying the same question into the criminal court. We do not find that the right to conduct a particular business in a particular place, whether in violation of a municipal ordinance, or to the prejudice of the rights of others, is a property right within the meaning of those cases.

[1] Applying the conclusions thus reached to the case at bar, we are of opinion that plaintiff has failed to show such a right of property as to entitle him to the injunction that he has obtained. It is true that he alleges, and that it is admitted, that he purchased the residence described in the petition; but he makes part of his petition the instrument relied on as evidencing his purchase, and the one thing which it makes perfectly clear is that it was not intended to operate as a sale, though it may be construed as a promise of sale, an option, or, perhaps, a lease, since it declares that, in the event of plaintiff's compliance with certain conditions, the other party will execute a deed, and of his noncompliance with those conditions, the payments made by him may be regarded as rent, and one who claims title under a written instrument should require no deed, nor can he as owner be indebted to himself for rent. The fact that the instrument was not recorded is further evidence of its intention, since, as the matter stands, the alleged vendor can, at any time, and the alleged vendee cannot, sell or mortgage the property to a third person.

In the cases to which we have referred, the property rights which were sought to be protected were acquired before the enactment of the ordinances by which they were invaded, and the ordinances were in the nature of ex post facto enactments which made it an offense to do with property that which did not constitute an offense when it was acquired; whereas, in the instant case, the agreement upon which plaintiff relies was entered into by him, say, two years after the enactment of the ordinance, and, as we think, with a view to its possible or probable enforcement as a valid enactment, which, whatever may be said in regard to the rights of the owner of the property, hardly presents a case for equitable consideration on behalf of the plaintiff.

[2] If, however, that view of the matter should be erroneous, we are still of opinion that plaintiff would not be entitled to the injunction, for the reason that we are not convinced that the enactment of the ordinance was beyond the police power of the city of Shreveport. The case appears to have been presented to the district court as though the plaintiff and the city were the only parties in interest and theirs the only property rights to be considered, and none of the residents, in the midst of whom it is proposed to establish plaintiff's mortuary business, were given a hearing, nor were any witnesses summoned in their behalf to testify either as to the probable effect of the intrusion upon the value of their property or upon their future enjoyment of life in their homes. We have been at some pains, however, to consider carefully the testimony of the witnesses called by plaintiff, and we learn from some of them that a swollen corpse, salvaged from the river, in midsummer, emits an unpleasant odor, but that they, being accustomed to handling such objects, do not mind it; from others, that they have lived in the neighborhood of undertaking establishments and have found them

not different from other places of residence, occasional odors from decayed corpses to the contrary notwithstanding: and from still others, that, living in such proximity, they have observed no odors and suffered no inconvenience. Where, however, in cases involving the suppression of nuisances, witnesses testify that a stench is emitted from a particular establishment, no one thinks it necessary to prove that it is unpleasant or nauseating to the vast majority of those whom it reaches, and who, not being employed in the establishment, have not become inured to it. The courts, we think, may safely take it for granted that, with rare exceptions, civilized human beings are in a greater or less degree made uncomfortable by foul odors, and by none more so than by those emitted from a badly decomposed human body.

It may be that bad cases are infrequent in plaintiff's establishment, and that the stench emitted by them is "brought under control" as rapidly as possible; but a single experience of air so laden would, as we imagine, more than satisfy the average individual for the period of his natural life, and 15 minutes would be quite long enough for the experience.

We find no reason to doubt that plaintiff conducts his business after the most approved methods and with as little offense to those by whom he may be surrounded as the business will admit; but, to the incidents mentioned, there is to be added the fact that the business itself is a gruesome one, and that the psychological influence of being confronted, and having one's family confronted, day after day and at all hours of the day, with death, and its woeful trappings in the shape of hearses and other vehicles, carrying in and out of a neighboring building the mortal remains of some fellow being, is no more enlivening nor wholesome than would be the constant presence of the same corpse, or the immediate proximity of a grave yard; and we take judicial notice that the introduction of such a business into a residential neighborhood, where none has previously been established, will inevitably depreciate the value of the property as well as discommode the owners. The case is therefore one in which the maxim, "Sic utere tuo," etc., is particularly applicable, and if the city of Shreveport had no power to enforce that maxim and protect its citizens in the peace and quiet of their homes, they would be entitled to much sympathy. But we find that act 220 of 1912 (amending the charter of that city), § 1, par. 21, after conferring on the council the power to "prohibit and prevent" various specified businesses, concludes with the following language:

"All establishments where any nauseous or unwholesome business may be carried on shall be restricted to certain limits within the city, to be determined by the city council."

And we think the business here in question is subject to the authority thus conferred.

[3] But, even if that were not the case, and there were no ordinance upon the subject, we can, at present, see no sufficient reason why the residents of the threatened district should not be protected from plaintiff's proposed invasion, under the general provisions of law which safeguards the citizen, in his home life, not only against nuisances per se, but against occupations which become nuisances by reason of the inappropriateness of the places in which they are conducted. The view thus suggested is ably expressed by the Supreme Court of Michigan in an opinion, the official report of which is not at hand, but which counsel for defendant has printed in full, as his brief, and which is said to have been handed down in a case entitled Saier v. Joy, 164 N. W. 507, L. R. A. 1918A, 825, on September 27, 1917.

The learned court states that the industry of counsel and its own investigations had

disclosed but two cases directly in point—the one, Westcott v. Middleton, 43 N. J. Eq. 478, 11 Atl. 490, and the other, Densmore v. Evergreen Camp W. O. W., 61 Wash. 230, 112 Pac. 255, 31 L. R. A. (N. S.) 608, Ann. Cas. 1912B, 1206—and that, in the case first mentioned, it appeared that defendant had been carrying on his business in its then location, in what was said to be a "populous part of the city," that a portion of the complainant's house was occupied for business purposes, that the case turned largely upon the question whether the undertaking business was a nuisance per se, and that complainant appeared to be of a supersensitive temperament; and the injunction was denied.

In the case last mentioned, the injunction was granted, on the ground that the business might become a nuisance by reason of its location (in a residential neighborhood) and surrounding circumstances.

Other cases mentioned are Ross v. Butler, 19 N. J. Eq. 294, 97 Am. Dec. 654, in which it was said:

"But, on the other hand, it" (the law) "does not allow any one, whatever his circumstances or condition may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim, 'sic utere tuo ut alienum non lædas,' expresses the well-established doctrine of the law."

And Barth v. Psychopathic Hospital Ass'n (Mich.) 163 N. W. 62, in which the erection and maintenance of a private insane asylum in a strictly residential district was prohibited, and it was said, inter alia:

"It must be conceded that the establishment of such an institution in close proximity to the residences of the plaintiffs, which are in a residential section of the city, would destroy the comfort, the well-being, and the property rights of the plaintiffs."

In the case before it, after finding that the danger, alleged by plaintiff, of diseases being communicated from the dead bodies taken to the premises of defendant, was neg-ligible, the learned court of Michigan went on to say:

"We are not so well satisfied that noxious odors will not escape defendant's premises. Formaldehyde is extensively used by them in embalming, deodorizing, and sanitation. The more complete the sanitation the more formaldehyde is used. It gives off a pungent odor, and it is quite doubtful to our minds that the odor would fail to reach adjacent houses situated as close as these houses especially in the summer time, when plaintiffs would expect to have, as they have a right to have, their windows open."

The court was not convinced that undertaking establishments, with morgues attached, were located in other cities in strictly residential districts, and expressed its views on the psychological aspect of the case as follows:

"We think it requires no deep research in psychology to reach the conclusion that a constant reminder of death has a depressing influence upon the normal person. Cheerful surroundings are conducive to recovery for one suffering from disease, and cheerful surroundings are conducive to the maintenance of vigorous health in the normal person. Mental depression, horror, and dread, lower the vitality, rendering one more susceptible to disease, and reduce the power of resistance. There is an abundance of testimony in the record confirmatory of this, and it is a matter of common knowledge."

And reference is made to funerals, funeral mourners, the taking in and out of the dead, the funeral music, the unknown dead lying in the morgue, the visitors seeking to identify them, and various other reminders of mortality incidental to an undertaker's establishment and likely to produce a depressing effect.

"We cannot overlook the right to engage in a lawful trade" (said the court), "nor the fact that the undertaking business is not only lawful but highly necessary, nor that it is not a nuisance per se. Nor can we overlook the right of the citizen to be protected in his home, and his right to the enjoyment there of that repose and comfort which are inherently his. The question here is, not the restraining of defendant's business, but the restraint of its introduction into a long-established and strictly residential district."

The conclusion reached was that the case appealed to the conscience and discretion of the court and called for injunctive relief.

In the case that we are now considering, the positions of the litigants being reversed, and the injunction issued by the district court operating to permit the establishment of the undertaking business upon a residential street, for the reasons thus assigned, it is ordered and decreed that the judgment appealed from be annulled, the injunction herein issued dissolved, the ordinance in question sustained as a valid enactment, plaintiff's demands rejected, and this suit dismissed at his cost.