## WILLIAM BARNES *versus* MARY HATHORN.

A tomb erected upon one's own land, is not necessarily a nuisance to his neighbor; but it may become such from locality and other extraneous facts.

Plaintiff proved that defendant's tomb, erected within forty-four feet of the former's dwellinghouse, contained, in 1856, nine dead bodies, from which was emitted such an effluvia as to render his house unwholesome; that, after an examination by physicians, the bodies were removed; that the tomb remained unoccupied thereafterwards, until 1865, when another body was therein interred; that the defendant's life was made uncomfortable while occupying his dwellinghouse, by the apprehension of danger arising from the use of said tomb; and, that the erection and occupation of said tomb had materially lessened the market value of his premises. In an action for damages on the foregoing facts; — *Held*, a nonsuit was improperly ordered.

ON EXCEPTIONS, from *Nisi Prius*, DICKERSON, J., presiding.

*Tallman & Larrabee*, for the defendant.

*Gilbert*, for the plaintiff.

KENT, J. — The facts, which the plaintiff proved or offered to prove, on which the presiding Judge ordered a nonsuit, are substantially as follows : — that the husband of the defendant, Mary Hathorn, in 1846, built a tomb on the premises now owned by her — and, within 44 feet from the west side of the plaintiff's house, and the windows of his parlor, sitting-room and dining-room, all of which rooms were on that side of his house ; that dead bodies were from time to time deposited in said tomb, until about the year 1856, when nine such bodies were in the tomb ; that such an effluvia was emitted from them that the plaintiff's house became unwholesome, and, after an examination of the premises by physicians, the defendant caused them to be removed from the tomb ; that the tomb remained unoccupied for six years, and until October, 1865, when the defendant caused the tomb to be opened and another dead body to be deposited for burial therein ; that there was a wooden frame building over the tomb, which was whitewashed ; that the tomb was

of brick, with ventilators at each end; that the plaintiff had resided for 25 years, and still resides, in a house owned by himself and on his lot of about three acres; that the defendant's land adjoins his, and the dividing line is 14 feet from his dwellinghouse, and her lot contains about 130 acres; that the erection and occupation of the tomb, as alleged in the writ, diminished the market value of the plaintiff's house and lot from $1000 to $1500, and that his life in the occupancy of his premises is made uncomfortable by the apprehension of danger arising from the use of said tomb as a burial place.

The plaintiff introduced two physicians, who testified that the effect of burying dead bodies in the tomb might be unwholesome and injurious to the occupants of the house; if much miasma, long continued and concentrated from them, it might be fatal; and that any emission from such bodies might be injurious to the physical and mental system; and, without any effluvia, it might injuriously affect the inmates of the house by exciting the imagination.

The action is for injury to the plaintiff by reason of a nuisance continued by the defendant.

The question before us is whether, upon the case as above stated, a nonsuit was properly ordered.

What is a nuisance? In considering this question, when the complaint is based upon the use of another of his own property, we are first met by the general doctrine of the right of every man to regulate, improve and control his own property; to make such erections as his own judgment, taste or interest may suggest; to be master of his own, without dictation or interference by his neighbors. On the other hand, we meet that equally well established and exceedingly comprehensive rule of the common law—"*sic utere tuo, ut alienum non laedas*"—which is the legal application of the gospel rule of doing unto others as we would that they should do unto us.

The difficulty is in drawing the line in particular cases, so as to recognize and enforce both rules, within reasonable

limitations. It is quite clear that the law does not recognize any legal right in any one to compel his neighbor to follow his tastes, wishes or preferences, or to consult his mere convenience. He cannot dictate the style of architecture or, generally, the location of the buildings — or maintain that an unsightly or ill-proportioned edifice is a nuisance because it offends his eye, or his too cultivated taste. Nor can he interfere because he has idle and unfounded fears of ill effects from the use of the adjoining lot. There may be many acts which, to the eyes of others, appear to be unneighborly and even unkind, and entirely unnecessary to the full enjoyment of the property — vexatious and irritating, and the source of constant mental annoyance, and yet they may be but the legal exercise of the right of dominion, and therefore cannot be deemed nuisances. The diminution of the market value of adjacent buildings, by such use, will not of itself make it a nuisance. But there is a limit to such right. No man is at liberty to use his own without any reference to the health, comfort or reasonable enjoyment of like public or private rights by others. Every man gives up something of this absolute right of dominion and use of his own, to be regulated or restrained by law, so that others may not be hurt or hindered unreasonably in the use and enjoyment of their property. This is the fundamental principle of all regulated civil communities, and without it society could hardly exist, except by the law of the strongest. This illegal, unreasonable and unjustifiable use to the injury of another, or of the public, the law denominates a nuisance. Such use may be a public nuisance, and it is so when it affects the community generally. When it affects an individual it is called a private nuisance. If, however, an individual sustains special damage to himself, beyond that common to the public by reason of a public nuisance, he may maintain an action for such special injury.

"Nuisance signifies anything that worketh hurt, inconvenience or damage." 3 Black. Com., 215. "Private nuis-

ances may be defined, anything done to the hurt or annoyance of lands, tenements or hereditaments of another." *Ib.*

"Nuisances to a dwellinghouse, are all acts done by another from without, which renders the enjoyment of life within the house, uncomfortable, whether it be by infecting the air with noisome smells, or with gasses injurious to health, or by exciting the constant apprehension of dangers." 2 Greenl. on Ev., § 466.

The general rule of law has been applied to many cases varying in their character and circumstances. We are at present chiefly interested in those relating to dwellinghouses, the habitations of men, although it is useful to examine the whole range of authorities, to extract, if possible, the true principles applicable to the subject.

There is one class of cases, arising from the exercise of trades or business, which are in their nature offensive, or which renders the occupation of buildings near them, unhealthy, or decidedly uncomfortable. Many of these cases may be found collected in a very recent case in this State. *Norcross* v. *Thoms*, 51 Maine, 503, and more fully in the case of *Brown* v. *Perkins*, 12 Gray, 97. It is unnecessary for us to repeat them here. From the general tenor of the reported cases, we find that certain doctrines are recognized and acted upon. One is, that some trades, occupations or acts are regarded as in themselves and inherently noxious, or offensive and prejudicial, without extraneous proof. In other cases they are not necessarily nuisances, but may become so from location or some extraneous fact. Another well established doctrine is, that it is not necessary to prove that the air is poisoned or rendered positively unhealthy; it is enough if the matter alleged to be a nuisance is offensive to the senses, or in any way renders the enjoyment of life and property uncomfortable. *State* v. *Haines*, 30 Maine, 65; *Rex* v. *White*, 1 Burr., 337; *Fish* v. *Dodge*, 4 Denio, 311; *State* v. *Pierse*, 4 McCord, 472; *Catlin* v. *Valentine*, 9 Paige, 575; *Rex* v. *Neil*, 2 Carr & Payne, 485.

Exciting, constant and reasonable apprehension of danger,

Barnes *v.* Hathorn.

although no actual injury has been occasioned, has been held
to be a nuisance. Thus, the keeping of large quantities of
gunpowder near inhabited dwellings, or by suffering an ad-
joining tenement to become ruinous and in danger of fall-
ing. 2 Greenl. on Ev., § 466, and cases before cited.

The definitions and rules applicable to cases as they arise,
must be general, and each case must be brought to the test
of the principles laid down. Usually, therefore, it be-
comes a mixed question of law and fact, whether, on the
case proved, the existence of a nuisance is established, or
not. If, however, it is clear upon the facts, that a jury
would not be authorized to find that a nuisance did exist,
the Judge would be justified in ordering a nonsuit.

The case finds that the erection and continuance of a
private tomb is the nuisance complained of. A man may
have a legal right to build such a tomb on his own land, as
a general proposition. It is not in itself and inherently a
nuisance to his neighbors. If a nuisance at all, it becomes
so from its locality or other extraneous facts. However
unwise or inexpedient it may be, in the judgment of re-
flecting men to deposit the remains of deceased relations
or friends in private burying places on private lands, con-
sidering the constant change in the title of real estate in
our country, and the almost certainty that in one or two
generations no one will be left to care for or protect the
graves, yet we know of no law which prohibits such erec-
tions or interments. But such tombs may be or may be-
come nuisances. On the facts stated, this particular tomb
was, at one time, beyond dispute, a very serious nuisance,
when it "was occupied by nine dead bodies which emitted
such an effluvia as to render the plaintiff's house unwhole-
some ;" and, after an examination of the premises by several
physicians, all the bodies were removed, it could hardly be
questioned that it was then a nuisance. But the defendant
says that, after these bodies were removed, it ceased to be
of such a character. Whilst the tomb remained for six
years unoccupied, the only ground on which it could be then

called a nuisance, probably, was its unpleasant proximity to the house of the plaintiff. It was only some fifteen paces from the windows of his dining and sitting room. It was certainly not a very cheering or exhilerating prospect which met the plaintiff's vision, whenever he looked abroad. How far, to a man of ordinarily nervous temperament, or to one of a sensitive nature, who shrunk from the constant view of this fixed memorial of death and decay, this erection might prove injurious to health, it is impossible to say.

But, that it must have affected his comfort and happiness in the occupation of his dwelling may be less questionable. There seems to have been no necessity for this close proximity, as the defendant's farm consisted of at least one hundred and thirty acres. On what ground this spot, almost under the droppings from the plaintiff's house, was chosen, instead of some retired place, on this large farm, does not appear, and is not, perhaps, material in our examination of the case.

But, it seems, after six years from the time of removal, the defendant again opens the tomb and commences the deposit of deceased friends anew. One such body had been thus placed in the tomb, before this action was brought. This act would seem to indicate an intention to again use it for the place of interment of her family. Now, considering the result stated as having been produced by the former occupation, might not a man of ordinary firmness and judgment be reasonably apprehensive of danger?

In addition to this, we have the testimony of the physicians called on the trial, that *any* emission from dead bodies in that tomb might be injurious to health, bodily and mentally. It had proved so before, and might again. A single body might not be so liable to create deadly or noxious effluvia as a larger number. But it would be of the same general character, and might of itself prove uncomfortable, if not positively unhealthy. The defendant made no disavowal of an intention to place other bodies there.

On the whole, we are of opinion, that the case should

have been submitted to the jury on the evidence, with proper instructions, and that the nonsuit was not properly ordered.         *Exceptions sustained.*

*Nonsuit set aside and new trial granted.*

CUTTING, WALTON, BARROWS, DANFORTH and TAPLEY, JJ., concurred.

DICKERSON, J., dissenting. — This is an action of review, and comes before us on exceptions to the ruling of the presiding Judge in ordering a nonsuit. Several questions arise under the bill of exceptions.

1. Whether allowing an unoccupied tomb, built of brick with ventilators at each end, covered with a wooden frame building, whitewashed, and situated forty-four feet from the dwellinghouse of the adjacent proprietor, to remain on one's premises is a nuisance *per se.* The injurious act imputed to the defendant in review is claimed to be a private nuisance which renders the dwellinghouse of the plaintiff in review uncomfortable, unhealthy, and valueless, as a residence.

The law of nuisance is designed to enforce the observance of that fundamental moral maxim : *sic utere tuo, ut alienum non laedas* — so use your own as not to injure another. This rule, however, must have a reasonable construction, or it would become oppressive in many instances, and defeat the benevolent purpose it was designed to subserve. In populous villages and cities, a tree cannot be planted, or a building erected without in some degree diminishing the quantity of light enjoyed by the adjacent proprietor. The smoke emitted from every additional chimney increases the quantity of unconsumed materials in the atmosphere, impairs its purity, and is oftentimes a source of annoyance and discomfort to others ; so is the sound of the factory bell, the steam engine, and railroad car. The same remarks are applicable with respect to the enjoyment of public rights. Mills cannot be successfully carried on without detaining, for a longer or shorter time, a portion of the water from

the mills below, equally entitled to its natural and unobstructed flow. Buildings cannot be moved along the public streets, or goods delivered at stores and warehouses, or logs detained, separated, and secured in booms. or ponds for manufacture, without temporarily obstructing the great public thoroughfares along and over which all have an equal right of free transit. It is plain that the literal enforcement of this maxim would embarrass the industry of the country, and materially retard the rapid development of the national resources, while, at the same time, it would diminish the sum of individual and social comfort and well-being.

The better interpretation of this rule of human conduct is that which harmonizes with that other maxim of the law, of equal authority, *de minimis non curat lex*, the law takes no notice of trifles. Persons cannot insist upon their extreme rights, and bring suits for every trifling inconvenience, annoyance or discomfort, they may experience on account of the use others may make of their own property. In entering civil society every person surrenders a portion of his rights for his own protection, and for the common good, both in respect to the limitations he may impose upon the manner in which others may enjoy their property, and the dominion he may exercise over his own. The common definition of nuisance — "anything that worketh hurt, inconvenience or damage" — is to be understood with reference to the subject matter, the time, manner, occasion and degree of discomforts, and the mutual adjustment of the common sacrifices of comforts incident to civil society. The annoyance, inconvenience or discomfort complained of must be a subsisting and substantial grievance, materially affecting the ordinary physical comfort of human existence, as understood by the American people in their present state of enlightenment, and not according to the crude and fanciful notions of a semi-barbarous, or less enlightened age. *Tipping* v. *St. Hellens Smelting Co.*, 116 Eng. Com. Law, 608; *Bamford* v. *Turnley*, 3 Best & Smith, 66; *Canby* v. *Ledbitter*, 106 Eng. Com. Law, 470.

In *State* v. *Haines*, 30 Maine, 77, the Court declined to pronounce a bowling alley a nuisance *per se*, though it held that such a structure might become a nuisance by being used in such a manner as to render the enjoyment of life uncomfortable to those residing in the neighborhood.   So a steam engine located on State street, in Boston, Mass., is not a nuisance.  *Saltonstall* v. *Banker & al.*, 8 Gray, 197.  Keeping fifty barrels of gunpowder in a house near dwellinghouses and near the public street, is not, *ipso facto*, a nuisance. *The People* v. *Sands & al.*, 1 Johns., 81 ; nor is a stable in a village.   1 Hilliard on Torts, 640.

It is not the kind of erection, or the thing kept, but the use made of it, and the time, place and manner of keeping, that determine the legal *status* in this respect.  ‘The structure may be faulty in its architectural proportions, and ill adapted for the purpose intended, or it may be even grotesque in its appearance, yet, if not used so as to cause substantial discomfort to the adjacent proprietors, these circumstances will not render it a nuisance.   So, the article kept or used, or the business carried on, though dangerous in its character, may be so managed in respect to time, place and manner, as to be harmless in the eye of the law.

The tomb erected by the devisor of the plaintiff in review, and by her allowed to remain on the devised premises, was a lawful erection ; for, whatever may be thought of the policy of private burial, the right is unquestionable.   In an unoccupied state, it could not have caused the defendant in review such substantial discomfort as the law imputes to a nuisance.   It may have been offensive to his tastes, but the law does not enter the domain of the fine arts, and establish styles of architecture ; and the apprehension of injury from future deposits therein that might never be made, and noxious smells that might never arise therefrom, is altogether too remote, not to say, fanciful, to base an action at law upon.

2. The next question raised by the bill of exceptions, is whether depositing a dead body in the tomb described, in

the month of October, and allowing it to remain therein till the fourth day of the following December, constitutes a nuisance, no offensive vapors having arisen therefrom during this interval. The gist of the action of nuisance is the damage, and the rule of damages in all cases is the amount of injury actually sustained at the commencement of the suit; no damages can be recovered for prospective injury. 2 Greenl. Ev., (8th Ed.,) 530. 1 Hilliard on Torts, 656.

The case finds that "no offensive vapors had come from the tomb," within six years next preceding the date of the original writ. When the original plaintiff brought his writ, he had suffered no actual injury. Had he reason to apprehend future injury? If so, did such apprehension occasion him the substantial discomfort necessary to make a nuisance?

While the authorities are clear, that, if the odors arising from a particular erection or business render the enjoyment of life and property disagreeable and uncomfortable, such erection or business is a nuisance, though the odors are not *unwholesome*, they do not go so far as to predicate a private nuisance upon the mere *apprehension* that noxious or offensive vapors may arise at some future time from a particular source. On the contrary, in all the reported cases of this sort in this country, and in England, it is believed, that *the existence* of some offensive effluvia is a necessary element in the matter complained of as a private nuisance. This theory, too, is in harmony with the rule of damages to which I have adverted. *Rex* v. *White*, 1 Burr., 337; *Rex* v. *Neil*, 2 Carr & Payne, 327; *Howard* v. *Lee*, 3 Sanf., 281; *Eames* v. *N. E. Worsted Co.*, 11 Met., 57.

There are cases, however, where acts done by another on his own land may constitute a nuisance to a dwellinghouse when they excite the constant and reasonable apprehension of injury. But, in all these cases, it is held that the danger must be actual and imminent, and not imaginary, conjectural or remote. In the language of Chancellor KENT, in *The People* v. *Sands & al.*, 1 Johns., 89, "The fears of mankind

alone will not create a nuisance without the existence of real danger." That case was an indictment for keeping fifty barrels of gunpowder in a house near a dwellinghouse, and near a public street. The Court held that this did not necessarily or *prima facie* constitute a nuisance, as it did not appear from the indictment that the powder was *carelessly* kept. *Non constat* that it was not a proper place to deposit such an article, time, place, and manner, being all important and essential elements in determining whether a powder house is a nuisance. In the language of Chief Justice HOLT, in *anonymous*, 12 Mod., 343, " there must be apparent danger or mischief actually done ;" or, as observes Mr. Justice FOWLER, in *Rex* v. *Taylor*, 2 Str., 1167, " the mere laying a thing to be *ad commune nocumentum* is not sufficient, but the Court must examine whether the fact laid implies a nuisance." The act of carelessly keeping great quantities of gunpowder near a dwellinghouse, or of making deep and dangerous excavations of the neighboring soil, or of suffering the adjoining tenement to go to decay, and be in danger of falling upon or otherwise injuring the adjoining tenement, or its inmates, implies imminent and actual danger, and it is for this reason that these particular cases have been held to be private nuisances ; take from these this element, as we have seen in the case of gunpowder, and they cease to be nuisances. 2 Greenl. Ev., (8th Ed.,) 522 ; *Brown* v. *Windser*, 1 C. & J., 26 ; *Dod* v. *Holme*, Ad. & E., 493.

No noxious vapors had arisen from the structure complained of between the month of October, when the remains were deposited therein, and the fourth day of December, when the original plaintiff commenced his suit; considering the season of the year none could reasonably have been expected or apprehended. The original plaintiff commenced his suit, when, according to the ordinary course of nature, it was utterly impossible that any miasma should arise from the remains for several months to come, if indeed any ever should arise. For ought that appears in

the case the deposit was temporary, to continue during the cold season, and then to be removed, as the other bodies had been removed by the devisor of the defendant in review at the original plaintiff's request. Though a witness himself, Barnes does not testify that he experienced any discomfort from the tomb as used by the defendant, or that he apprehended any injury whatever therefrom. It would be an impeachment of the intelligence which every suitor is presumed to possess, to suppose that he apprehended any immediate injury under these circumstances. When the testimony fails to disclose any injury the Court cannot find any damage, and if there is no damage the action cannot be maintained. The Court cannot indulge in fears not shared in by the plaintiff himself. To adjudge the tomb in question to be a nuisance, under this proof, would be in effect to declare the receiving tombs in many of our public cemeteries nuisances. To avoid snow and frost they are usually built upon the highway for the safe keeping of remains during the cold season. Travellers, or persons residing in the vicinity of such tombs, might with equal propriety sue the proprietors of these cemeteries for maintaining a nuisance. It is hardly worth while to invite such litigation.

Undoubtedly a tomb may be so built and used as to become a nuisance; and I would by no means intimate that a party is without remedy who has reasonable ground to apprehend injury from such a source. It is the peculiar province of courts of equity to interfere by way of injunction to restrain or prevent irreparable mischief to health, trade, means of subsistence or permanent ruin to property. 2 Story's Eq. Jur., §§ 925–27.

3. There was no error in excluding the testimony offered. The defendant in review, being without legal fault in the use of her property, is not liable for any real or supposed depreciation in value resulting therefrom to the property of the plaintiff in review. The plaintiff would have no claim on her for the increased value of his property growing out of her lawful acts upon her own land, nor has he

any claim on her for damage occasioned by the same cause. If his property has depreciated in value from this cause it is *damnum absque injuria*.    The nonsuit was properly ordered, and there should be judgment for the original plaintiff.