[No. 8962.    Department Two.    December 15, 1910.]

AL. DENSMORE et al., *Respondents*, v. EVERGREEN CAMP NO. 147, WOODMEN OF THE WORLD et al., *Appellants*.[1]

NUISANCES—WHAT CONSTITUTES — UNDERTAKING ESTABLISHMENTS —RESIDENCE DISTRICT. The maintenance of an undertaking establishment in the residence section of a city, within a few feet of residences, while not a nuisance *per se*, may be enjoined as a nuisance, where it appears that, although maintained with every sanitary precaution, noxious odors and gases will permeate the nearby residences, and that there is danger of infection and contagion; and notwithstanding the fact that the owner intends to occupy the second story of the building as a residence.

Appeal from an order of the superior court for Snohomish county, Joiner, J., entered March 23, 1910, in favor of the plaintiffs, enjoining the conducting of an undertaking business in the residence portion of a city. Affirmed.

*Noah Shakespeare* and *Bell & Anderson*, for appellants.

*Cooley & Horan* and *R. Mulvihill*, for respondents.

CHADWICK, J.—Hewitt avenue is the principal business street in the city of Everett. Wall street runs parallel

[1]Reported in 112 Pac. 255.

thereto. One of the cross streets is Hoyt street. A business block runs back from Hewitt avenue one hundred and twenty feet. The remainder of the block on Hoyt street is occupied by residences. The next block to the south is entirely given up to residences, so that, in the opinion of a witness who had been in the real estate business for ten years in the city of Everett, the property owned and occupied by the plaintiffs was situated in a residence district. A short time before this action was begun, Evergreen Camp No. 147, Woodmen of the World, had moved a three-story building, formerly used as a residence, onto lots 26 and 27. Plaintiffs Densmore are the owners of lots 28 and 29, and plaintiffs Mathewson are the owners of lots 23 and 24. The building owned by the Woodmen Camp now stands within three or four feet of the Densmore residence and about thirty-five feet from the Mathewson residence, being between the two. At about the time the building was moved onto the lots, it was leased by the Woodmen Camp to defendants Maulsby, who purposed to start an undertaking establishment therein. Plaintiffs protested to one or more of the officers of the Camp, and this proving of no avail, the present action was begun, resulting in a temporary injunction, after a full hearing upon the facts. Testimony offered to show that the property of appellants would be depreciated in value was excluded by the court.

That an undertaking establishment is not a nuisance *per se* may be assumed without citing authority. It is shown that it is the purpose of the appellant Maulsby to maintain every sanitary precaution known to the profession of morticians. The question before us is whether such an establishment, by reason of its location and being operated in a legitimate manner, may be or become a nuisance within the definition of the statutes of this state. In the case of *Everett v. Paschall, ante* p. 47, 111 Pac. 879, we called attention to the fact that the question of nuisance or no nuisance cannot be determined by reference to the rules

of the common law, but that each case must be considered upon its own facts.   For in this age, when population is becoming more and more congested in the cities, it would be manifestly unfair to grant injunctive relief only in those cases where the object attacked was a nuisance *per se*, when other circumstances or conditions intervene which might tend to destroy the repose and comfort of a part of a city or town given over to homes.   In this case, as in that, the element of comfort and repose in the enjoyment of the home becomes an essential element of our inquiry.   For it is not only shown by the evidence, but it may be accepted as within the common knowledge of man, that the immediate presence of those mute reminders of mortality, the hearse, the chapel, the taking in and carrying out of bodies, the knowledge that within a few feet of the windows of one's dwelling house where the family sleep and eat and spend their leisure hours, autopsies are going on, that the dead are there, cannot help but have a depressing effect upon the mind of the average person, weakening, as the testimony shows, his physical resistance and rendering him more susceptible to contagion and disease.   There is evidence tending to show that noxious odors, gases, especially those arising from the deodorants used in cleansing the premises, would permeate the homes of respondents; that there is danger of infection and contagion from the proximity of the morgue, and the possibility of flies passing from one place to the other.   This testimony is supplied by physicians sworn as experts.   Their testimony is denied or minimized by the appellant Maulsby and other undertakers who were called as witnesses, but the fact that reasonable men of fair minds differ upon these questions impelled the trial judge to find against appellants upon the facts, and warrants us in subscribing to his view that the danger is at least probable.

"The law takes care that lawful and useful business shall not be put a stop to on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves

of a fastidious or over refined person. But, on the other hand, it does not allow any one, whatever his circumstances or condition may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. The maxim, *sic utere tuo ut alienum non laedas*, expresses the well established doctrine of the law." *Ross v. Butler*, 19 N. J. Eq. 294, 97 Am. Dec. 654.

We think the facts, as established by the evidence and found by the court below, bring this case within the rule of the cases cited in *Everett v. Paschall, supra; Deaconess Home & Hospital v. Bontjes*, 207 Ill. 553, 69 N. E. 748, 64 L. R. A. 215; *Baltimore v. Fairfield Imp. Co.*, 87 Md. 352, 39 Atl. 1081, 67 Am. St. 344, 40 L. R. A. 494; *Cherry v. Williams*, 147 N. C. 452, 61 S. E. 267, 125 Am. St. 566.

In *Barnes v. Hathorn*, 54 Me. 124, a tomb had been erected within forty-four feet of the plaintiff's dwelling, in which dead bodies had been kept. They were finally removed, but after a lapse of six years a body was placed in the tomb. In reversing a judgment of nonsuit, the court said:

"It was only some fifteen paces from the windows of his dining and sitting room. It was certainly not a very cheering or exhilarating prospect which met the plaintiff's vision, whenever he looked abroad. How far, to a man of ordinarily nervous temperament, or to one of a sensitive nature, who shrunk from the constant view of this fixed memorial of death and decay, this erection might prove injurious to health, it is impossible to say. . . . In addition to this, we have the testimony of the physicians called on the trial, that *any* emission from dead bodies in that tomb might be injurious to health, bodily and mentally. It had proved so before, and might again. A single body might not be so liable to create deadly or noxious effluvia as a larger number. But it would be of the same general character, and might of itself prove uncomfortable, if not positively unhealthy."

The fact that some courts have not drawn a consistent line between nuisances *per se* where the injury is real and hurtful to the physical senses, and those cases where the nuisance is mental or destructive of comfort and repose, has led to

much confusion. But the rule that a thing may or may not be a nuisance according to the manner in which it is used, or the situation in which it is placed, or the time it has been carried on without complaint, when measured by the mind and taste of the average citizen, furnishes a guide as certain as it is possible to state a rule in a class of cases where, at best, there must be an element of compromise.

The case of *Westcott v. Middleton,* 43 N. J. Eq. 478, 11 Atl. 490, is relied upon by appellants. It is the only case cited and, so far as we have been able to discover, it is the only case in the books, where it was sought to restrain an undertaking establishment. It is seemingly in point, yet it may be distinguished from the case at bar. There, so far as the decision indicates, the undertaking establishment was in the most populous section of the city. We may assume that it was not in a residence section, for the lower floor of the building occupied by the complainant was given over to business purposes, the upper floors only being occupied for residence purposes; and further, the establishment had been carried on without complaint for eleven years. Furthermore, the court found that the complainant was of a supersensitive nature rather than one possessed of the plain, sober, and simple notions prevailing among the English people, as is stated in the books; that he had a horror of such things in excess of the ordinary person, so much so that in the seventy-two years of his life he had not attended to exceed half a dozen funerals. We think, from reading that opinion, that it comes within the rule announced in *Gilbert v. Showerman,* 23 Mich. 447, where the complainant had taken up his residence over a store in a part of the city chiefly given up to business, and then sought to restrain the operation of a steam flouring mill located on adjoining property. Chief Justice Cooley, who rendered the opinion of the court, speaking of offensive trades, said:

"Even the most offensive trade, as we have seen, is allowed to be carried on in a *remote* place; and this means, not a place

remote from all other occupations and trades, but remote
from such other occupation or trade as would be specially
injured or incommoded by its proximity; in other words, in a
place, which, in view of its offensive nature, is a proper and
suitable one for its establishment.   The most offensive trades
are lawful, as well as the most wholesome and agreeable; and
all that can be required of the men who shall engage in them
is, that due regard shall be had to fitness of locality.   They
shall not carry them on in a part of the town occupied mainly
for dwellings, nor, on the other hand, shall the occupant of a
dwelling in a part of the town already appropriated to such
trades, have a right to enjoin another coming in because of
its offensive nature.   Reason, and a just regard to the rights
and interests of the public, require that in such case the en-
joyments of pure air and agreeable surroundings for a home
shall be sought in some other quarter; and a party cannot
justly call upon the law to make that place suitable for his
residence which was not so when he selected it.   In the case
before us we find that the defendants are carrying on a busi-
ness not calculated to be specially annoying, except to the
occupants of dwellings.   They chose for its establishment a
locality where all the buildings had been constructed for pur-
poses other than for residence.   Families, to some extent,
occupied these buildings, but their occupation was secondary
to the main object of their construction, and we must suppose
that it was generally for reasons which precluded the choice
of a more desirable neighborhood."

The testimony in this case further shows that it is the in-
tention of the defendant Maulsby to occupy the upper stories
of the building as a residence, but we believe that this fact
will not take this case out of the general rules of the law.   In
*Cleveland v. Citizens Gas Light Co.*, 20 N. J. Eq. 201, 205,
Chancellor Zabriskie, who is perhaps more frequently quoted
as an authority upon the subject of nuisance than any other
American jurist, said:

"The discomforts must be physical, not such as depend
upon taste or imagination.   But whatever is offensive
physically to the senses, and by such offensiveness makes life
uncomfortable, is a nuisance; and it is not the less so because
there may be persons whose habits and occupations have

brought them to endure the same annoyances without discomfort. Other persons or classes of persons whose senses have not been so hardened, and who, by their education and habits of life, harden the sensitiveness of their natural organization, are entitled to enjoy life in comfort as they are constituted."

Mr. Bishop, in his Non-Contract Law, § 418, has stated the underlying principle in this class of cases as follows:

"Two things essential to the general prosperity and happiness are useful trades, whereby people are supplied with things necessary in life, and healthful and peaceful dwellings. . . . The courts, in administering justice between them, necessarily require each to lay aside something of what pertains to mere convenience and comfort, yet they permit each to stand so far on its own rights as not to be destroyed."

The decree of the lower court, being thus sustained by the authorities upon the subject, is affirmed.

RUDKIN, C. J., MORRIS, DUNBAR, and CROW, JJ., concur.