JACK LEWIS, INC., *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 98, October Term, 1932.]

*Decided January 19th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. Purdon Wright,* for the appellant.

*Ernest F. Fadum, Assistant City Solicitor,* with whom was *R. E. Lee Marshall, City Solicitor,* for the appellees.

*William L. Marbury* filed a brief as *amicus curiae.*

148

OFFUTT, J., delivered the opinion of the Court.

Acting under the authority conferred by chapter 705 of the Acts of 1927, the Mayor and City Council of Baltimore on March 30th, 1931, adopted Ordinance No. 1247, known as the Zoning Ordinance, the purpose of which is to regulate and restrict "the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards and other open spaces, the density of population and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes." Under that ordinance, the city is divided and classified in height, use, and area districts, the outlines of which are shown on maps or plats adopted with the ordinance as a part of it.

The use districts are classified as industrial, second commercial, first commercial, and residential. Among other things, it provides that no undertaking establishment, business, or funeral home shall be located in a residential use district (paragraph 8, subsection 32), but does not prevent the continuance of such a use if legally existing at its date (section 11). The building engineer, the first official charged with the enforcement of the ordinance, is forbidden to issue any permit for the construction, reconstruction, extension, repair, or alteration of any building or part thereof unless the plans and specifications "and intended use of such building" conform to the ordinance, and in case of any prohibited use he is authorized, in addition to such other remedies as he may have, to institute an appropriate action or proceeding to prevent or abate the same (section 31). From any decision of the building engineer there may be an appeal to the board of zoning appeals by any person aggrieved (section 32), which shall have the following powers:

"1. To hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by the building engineer in the enforcement of this ordinance.

"2. To hear and decide special exceptions to the terms of this ordinance upon which the board is required to pass under this ordinance.

"3. To authorize upon appeal in specific cases such variance from the terms of this ordinance as is necessary to avoid arbitrariness and so that the spirit of the ordinance shall be observed and substantial justice done."

And, by section 33(b), it may "grant a permit when there are any practical difficulties or unnecessary hardships in the way of carrying out the strict letter of any of the provisions of this ordinance."

On January 7th, 1932, Jack Lewis, Inc., an undertaker, filed with the building engineer of Baltimore City an application for a permit to make certain "alterations or repairs" in a private home known as 1804 Eutaw Place in said city, to adapt it to use as a "funeral home." The proposed location is in territory shown on the use district map, adopted as a part of the zoning ordinance, as a "residential use district," and the application was refused on the ground that the proposed use would violate section 8 of that ordinance. That decision was affirmed on appeal by the board of zoning appeals, and thereupon the applicant, under section 35 of the ordinance, filed a petition in the Baltimore City Court asking that court to review the decision of the zoning board. An order was accordingly signed, directing the board of zoning appeals to transmit to that court all documents, records, papers, plats, and memoranda relating to the case. The ground alleged in the petition for the relief prayed was that the refusal of the permit deprived the petitioner of his property without due process of law, and amounted to a taking of the same without compensation, that it denied it the equal protection of the law, that it was illegal, arbitrary, unreasonable, oppressive, discriminatory, and confiscatory. The respondents in their answer or return denied the existence of the grounds for relief alleged in the petition, and the court, after a hearing, dismissed the appeal. From that order the applicant appealed to this court.

Neither in the pleadings, nor in the written or oral arguments in this court, is there any objection to the constitutionality of the use provisions of the ordinance as a whole, nor to the propriety or legality of the classification scheme or plan indicated on the "use district map," and adopted as a part of the ordinance itself, but the grounds of complaint are (1) that, conceding the legality of the ordinance and such classification, the action of the mayor and city council in excluding funeral establishments from residential use districts is arbitrary, unreasonable, and not justified by any legitimate exercise of the police power, and (2) that the ordinance unlawfully delegates to administrative officials the police power of the State, in that it permits them at their arbitrary discretion to grant or withhold permits such as that for which the applicant applied.

Considering these objections in inverse order, it is impossible to distinguish the delegation of power found in section 32, subsection (g-3), and section 33, subsection (b) from that which this court condemned as unlawful in *Goldman v. Crowther,* 147 Md. 282, 128 A. 50. The board of zoning appeals is a mere administrative agency, created and empowered to execute the provisions of the ordinance which the mayor and city council as its primary delegate has, in the exercise of the State's police power, adopted. For as it was said in *Pocomoke City v. Standard Oil Co.,* 162 Md. 377, 159 A. 902, 905: "Where the power is exercised directly by the agency or delegate, the validity of acts done under its authority is determined by whether its acts in a particular case are upon the facts of such case reasonably necessary to the protection of the public welfare, but, when any part of it is further delegated by the municipality to subordinate officials, the validity of their acts under it may depend upon whether the grant or delegation to such officials vested them with a complete and uncontrolled discretion, or whether it vested them with mere ministerial and administrative functions, to be exercised in obedience to and in conformity with definite rules, guides, and standards. In the former case the right to use the power in support of an act pretended to be

done under its authority is denied, not because the act is not reasonably necessary to the public welfare, but because the delegation of power is too broad and indefinite, while in the second case ordinarily it is permitted, and the sole inquiry is whether acts done under it are reasonably necessary to the public welfare." Under these particular provisions the board of zoning appeals is in effect given the power to set aside or annul the ordinance as to any given case with no more definite standard or guide than that such action may only be taken when there are "practical difficulties or unnecessary hardships" in the way of carrying out its strict letter, or where necessary to "avoid arbitrariness and so that the spirit of the ordinance shall be observed and substantial justice done." It is, of course, implicit in other provisions of the ordinance that the board is, in the discharge of its duties, to avoid arbitrariness, to do substantial justice, and not to inflict unnecessary hardship, but under our system of written constitutions it is essential that they accomplish those highly desirable objects in conformity with the restrictions, rules, and limitations which the law itself provides and not in disregard of them. The grant of a power such as that conferred by those provisions to an administrative agency, such as the board of zoning appeals, must, therefore, to be valid, be so defined and limited that both the citizen and the board may know with certainty what their rights, privileges, and powers under it are. If there are to be departures from its general plan or scheme, in order to supply the necessary elasticity to its efficient operation, they must be protected by such clear and definite guides as those afforded by sections 12, 13, 27, and 29, and may not be left to the unguided discretion of administrative officials. For such phrases as "practical difficulties," "unnecessary hardships," "substantial justice," are too general and indefinite to furnish such a guide, or to mark the limits or control the exercise of the power conferred by those provisions upon the board.

But it is not apparent how the illegality of those particular provisions helps the appellant in this case. They are not in any way essential to, nor does their illegality affect, the

ordinance as a whole, and what it complains of in this case is that the discretion conferred upon the board to set aside the ordinance, in cases where in their judgment such action would be justified, was not exercised in this case to set it aside as to it. That is, it says at the same time that the delegation of power is unlawful and cannot be exercised at all, and that it should have been exercised to grant to it a permit which other provisions of the ordinance prohibited.

So that the final and substantial question in the case is a very narrow one, whether that provision of the ordinance which excludes funeral establishments, other than those already existing, from a residential use zone, is unlawful.

In dealing with that question we need not consider the constitutionality of the general provisions of the ordinance which deal with residential uses, but only the specific provision which excludes from residential districts funeral establishments, for, as stated, appellant challenges no other part of it except section 32, subsection (g-3), and section 33, subsection (b), which we have already considered, *supra.*

In dealing with the question, it cannot be considered as though it were in a vacuum detached and apart from the facts and circumstances which give it life, reality, and color, but it must necessarily be considered in connection with such facts and circumstances, for they alone can determine whether it is a valid exercise of the police power. It is intimated in appellees' brief that the case of *Euclid Village v. Ambler Realty Company,* 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, has in some manner overruled the principles announced in *Goldman v. Crowther, supra,* but that is not so. The *Goldman* case was based upon the Constitution of this State, which has not been amended in any manner so as to affect that decision, and it is, of course, unaffected by the decision in the *Euclid* case, which dealt with the Federal Constitution and not with the Constitution of this State. As stated in the case of *Goldman v. Crowther,* restrictions imposed by the State upon private property in the exercise of its police power can only be justified where they are required for the reasonable protection of the public health, morals, safety, or

welfare, but, where any such necessity exists, the power may be invoked to sustain them. *Pocomoke City v. Standard Oil Co., supra.*

Whether a restriction in a given case is reasonable or not depends, not so much upon the application of general principles or rules, as upon the facts and conditions out of which the question arises. The first as well as the last law of nature is self-preservation, and, as laws are made for men and not men for laws, they must, if the law is to be a living thing, be construed with a due regard for the wisdom of that homely and changeless truth. With the high tension of the industrial civilization of today, the massing of vast numbers of people in small areas, and the steady progress of sanitary science, it has become apparent that the common safety and welfare require, in congested centers of population, many restrictions on the use of property which could not be justified and would not be tolerated where no such congestion exists. Nor does a due consideration for the public safety and welfare necessarily stop with protection against the spread of disease, the ravages of fire, the hazards of traffic, or the predatory activities of the lawless, but it may properly extend to the maintenance of conditions under which people may live and work in reasonable comfort, and without unnecessary impairment of their physical and mental vigor. To afford that protection it is obvious and inevitable that the use of property in a densely populated city should be subjected to restrictions which in individual cases may be burdensome and oppressive, but which are essential if the whole body of the people are to live in safety and with some measure of comfort. And yet the value of property lies always in the use that may be made of it, and as freedom of use narrows its value may lessen. But the same organic law, which protects the owner of property in some remote sparsely settled rural locality in his right to use it as he will, applies with equal force to the owner of property in a densely populated city. Consequently there has been in the establishment and the enforcement of restrictions on the use of property in cities a constant struggle between "precedent and progress,"

154

between the letter and the spirit of the law, and between the rights of property and the rights of men. The burden which that struggle has placed on the court is not new, for some twenty years ago Frederick R. Coudert said: "The courts have indeed to find a middle way between precedent and progress or certainty and justice. No infallible method can be found to avoid this dilemma. Doubtless some courts have gone to one extreme, others to the other. I can only suggest that constitutional decisions be fairly and fully discussed and that, where the highest courts cannot sustain legislation by fair reasoning and with due regard for that settled precedent without which law is not differentiated from anarchy, then proper amendment be made to the Constitution." Certainty and Justice, page 33. But while the language of the Constitution does not change, it may nevertheless mean one thing when applied to one set of facts, and an entirely different and contrary thing when applied to another. To prevent the owner of a farm in the country from keeping a barnyard or a pig pen thereon would probably be held to deprive him of his property without compensation, while to prevent the owner of land in the residential district of a city from maintaining similar conveniences there would not be open to the same objection. To prevent the owner of property in the shopping district of a city, where great numbers of people congregate, from using it as a storage warehouse for high explosives, would not deprive him of his property without compensation, while to prevent an owner of land remote from any habitation might have that effect. So that, in deciding whether denying to the owner of property in a residential use district the right to use it as a "funeral home," which appears to be a euphemism for an undertaking establishment, is so unreasonable as to amount to a taking of his property without due process of law and without compensation, the restriction must be considered in connection with the conditions to which it applies. As stated above, the right of the appellees to establish residential use districts is not questioned by the appellant, but his contention is that the use of his property as an undertaking establishment is not

so inconsistent with the residential character of the district in which it is located, as to justify the denial of his right to so use it. But the State, acting through its delegate, the Mayor and City Council of Baltimore, has said otherwise, and, upon the facts, it cannot be said as a matter of law that its conclusion was either unreasonable or arbitrary.

Such an establishment, considered merely with reference to its incidents, and not its location, is neither a public nor a private nuisance, *per se,* but to justify its exclusion it need not be either, since such action would be justified if in fact the proposed use would unreasonably and adversely affect the health or comfort of persons, other than the applicant, residing in that district.

From the character of the applicant, it is highly probable that the business will be conducted in the least offensive and most unobjectionable manner possible, but, even so, it will nevertheless be an undertaking business. That such a use may adversely affect persons residing in the immediate neighborhood of the proposed establishment in the comfortable enjoyment of their homes, and lessen the value thereof for residential purposes, is neither an arbitrary nor an unnatural presumption, but on the contrary it is an inevitable inference from common knowledge of the nature and the minds of men. Because of their mortal nature, the certainty of death and the uncertainty of the time thereof, there is in the human race an instinctive horror of death, and upon the intuitive desire to postpone or avoid it rests the first great law of nature. Much of the world's wealth is spent in prolonging life, the severest punishment known to the law is to be deprived of it, and few there are who when the last call comes "leave the warm precincts of the cheerful day nor cast one longing lingering look behind." Death to the ordinary man is associated always with sorrow and pain, with the loss of those nearest and dearest to him, with severed friendships that may not be renewed, and with the dissolution of ties of love and affection which sweetened his life, and cheered and consoled him in misfortune and adversity. Consequently, to one of normal sensibilities, the presence of dead bodies, the gloomy trappings

of funeral woe, the pall, the hearse, the shroud, and the casket, the knowledge that within a few feet of him bodies are being prepared for sepulture, the unending coming and going of funeral processions, must have a depressing and disturbing effect wholly inconsistent with the healing repose and respite from work and worry which, whatever its character, is usually associated with the atmosphere of the home. And in dealing with the question in issue here, such factors are quite as much entitled to consideration as those which have a more direct, tangible, and physical effect, for it cannot now be doubted that physical deterioration may and probably will result from conditions which constantly depress and disturb the mind, nor, as was pointed out in *City of Baltimore v. Fairfield Imp. Co.,* 87 Md. 364 *et seq.,* 39 A. 1081, 1084, is it essential that the sensations aroused by such condition be based upon demonstrable facts. In that case Judge McSherry for the court, referring to the establishment of a hospital for the treatment of leprosy, said: "There are modern theories and opinions of medical experts that the contagion is remote, and by no means dangerous; but the popular belief of its perils, founded on the Biblical narrative, on the stringent provisions of the Mosaic law that show how dreadful were its ravages, and how great the terror which it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries, cannot, in this day, be shaken or dispelled by mere scientific asseveration or conjecture. It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or remotely contagious, but the question is whether, viewed as it is by the people generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located."

Counsel for appellant, in a very careful and useful brief, has stressed with much force the contention that the business in itself is lawful, and carries no necessary menace of contagion or disease; that it will not affect the physical health or comfort of those in its neighborhood; and that its effect on their minds is of such an insubstantial and unreal character as not to afford a legal basis for its exclusion from a residen-

tial neighborhood. But while there are cases which support that view, the weight of authority, and certainly the trend of recent cases, is the other way.

In *Saier v. Joy,* 198 Mich. 295, 164 N. W. 507, 508, there was a bill to enjoin the establishment of an undertaking establishment in a residental neighborhood. The court found upon the evidence that the value of plaintiff's property would be decreased, that there would be no danger from disease but that it was not certain that odors arising from the use of chemicals might not escape. In dealing with those facts it said: "We think it requires no deep research in psychology to reach the conclusion that a constant reminder of death has a depressing influence upon the normal person. Cheerful surroundings are conducive to recovery for one suffering from disease, and cheerful surroundings are conducive to the maintenance of vigorous health in the normal person. Mental depression, horror, and dread lower the vitality, rendering one more susceptible to disease, and reduce the power of resistance. * * * We cannot overlook the right to engage in a lawful trade, nor the fact that the conduct of the undertaking business is not only lawful, but highly necessary, nor that it is not a nuisance *per se.* Nor can we overlook the right of the citizen to be protected in his home, and his right to the enjoyment there of that repose and comfort that are inherently his. The question here is not the restraining of defendants' business, but the restraint of its intrusion into a long-established and strictly residential district." It held that, upon the maxim *"sic utere tuo ut alienum non laedas,"* the injunction should issue.

In *Osborn v. Shreveport,* 143 La. 932, 79 So. 542, 548, where the question was whether the municipality could prevent the establishment of an undertaking establishment, under an ordinance authorizing it to prevent the establishment in certain localities of places where a nauseous or unwholesome business might be carried on, it was said: "But, even if that were not the case, and there were no ordinance upon the subject, we can, at present, see no sufficient reason why the residents of the threatened district should not be

158

protected from plaintiff's proposed invasion, under the general provisions of law which safeguards the citizen, in his home life, not only against nuisances *per se,* but against occupations which become nuisances by reason of the inappropriateness of the places in which they are conducted." The same result was reached in *Rowland v. Miller,* 139 N. Y. 93, 34 N. E. 765, where it was held that an undertaking establishment "violated a covenant against the establishment of an injurious or offensive business."

In *Densmore v. Evergreen Camp,* 61 Wash. 230, 112 P. 255, where it was proposed to locate an undertaking establishment in a residential neighborhood, the court, conceding that it was not a nuisance *per se,* said: "In this age, when population is becoming more and more congested in the cities, it would be manifestly unfair to grant injunctive relief only in those cases where the object attacked was a nuisance *per se,* when other circumstances or conditions intervene which might tend to destroy the repose and comfort of a part of a city or town given over to homes." After referring to *Westcott v. Middleton,* 43 N. J. Eq. 478, 11 A. 490, *contra,* it cited, in support of its conclusion that the use might be enjoined, this quotation from Chancellor Zabriskie in *Cleveland v. Citizens' Gaslight Co.,* 20 N. J. Eq. 201: "The discomforts must be physical, not such as depend upon taste or imagination. But whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so, because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort. Other persons or classes of persons whose senses have not been so hardened, and who, by their education and habits of life, retain the sensitiveness of their natural organization, are entitled to enjoy life in comfort as they are constituted."

In dealing with a similar question, it was said in *Cunningham v. Miller,* 178 Wis. 220, 189 N. W. 531, 534: "The great weight of authorities in this country is to the effect that the establishment and operation of an undertaking and embalming business in a residential section under such cir-

cumstances constitutes a nuisance. *Saier v. Joy,* 198 Mich. 295, 164 N. W. 507; *Densmore v. Evergreen Camp,* 61 Wash. 230, 112 P. 255; *Stotler v. Rochelle,* 83 Kan. 86, 109 P. 788; *Barnes v. Hathorn,* 54 Me. 124; *Cleveland v. Citizens' Gaslight Co.,* 20 N. J. Eq. 201; *Barth v. Christian Psychopathic Hospital Assn.,* 196 Mich. 642, 163 N. W. 62; *Middlestadt v. Waupaca Starch & Potato Co.,* 93 Wis. 1, 66 N. W. 713." In *Tureman v. Ketterlin,* 304 Mo. 221, 263 S. W. 202, 204, 43 A. L. R. 1158, the court announced the result of the consideration given the question in a number of recent and well-considered cases in this language: "The business of preparing dead bodies for burial is not only lawful but indispensable. It may become a nuisance, however, from the manner in which it is conducted or because of the place at which it is maintained, and it is very generally held to be such when it intrudes itself into a strictly residential district. *Beisel v. Crosby,* 104 Neb. 643, 178 N. W. 272; *Densmore v. Evergreen Camp,* 61 Wash. 230, 112 P. 255; *Saier v. Joy,* 198 Mich. 295, 164 N. W. 507; *Meagher v. Kessler,* 147 Minn. 182, 179 N. W. 732; *Osborn v. Shreveport,* 143 La. 932, 79 So. 542; *Goodrich v. Starrett,* 108 Wash. 437, 184 P. 220; *Cunningham v. Miller,* 178 Wis. 22, 189 N. W. 531. The essential ground of such holding is that the maintenance of an undertaking establishment in a residence district tends to destroy the comfort, well being, and the property rights of the owners of homes therein."

In this case it appears from the record that the district in which the proposed establishment is to be located is a long established residential neighborhood, in which the houses are contiguous on a city street, and that, in the opinion of persons residing in that neighborhood, many of whom are intelligent persons of recognized standing in the professional and commercial life of the city, it will lessen the value of their homes, and render them less desirable for residential purposes. It cannot be assumed that these witnesses are abnormal or hypersensitive, or that normal healthy persons would not be affected as they say they will be. But, on the other hand, their statements are so consistent with common

knowledge and experience that, in the absence of substantial evidence to the contrary, they should be accepted as true. There is evidence to the contrary, but for the most part it is that of persons engaged in the same business as that of the applicant, who necessarily, as a result of their training and experience, have not the same reaction to its incidents as would the average man. And while the evidence as to the effect of the business upon nearby property is vague, it may be assumed, as a matter of common knowledge, that one looking for a home would not likely select one adjacent to an undertaking establishment, if he could for the same money secure one equally desirable elsewhere.

Applying the principle stated above to those facts, it cannot be said that that provision of the ordinance, which excludes undertaking establishments from residential use districts, is either arbitrary or unreasonable, or that it violates any provision of either the State or the Federal Constitutions, but it is, on the contrary, a valid and legitimate exercise of the police power, delegated by the State to the Mayor and City Council of Baltimore. The order of the city court dismissing the appeal will therefore be affirmed.

*Order affirmed, with costs.*

PARKE, J., filed a dissenting opinion as follows:

The writer concurs in the decision of the court that section 32, subsection (g-3), and section 33, subsection (b), are void; but, while admitting the force of the reasoning displayed and of the adverse trend of decision in this and other jurisdictions, he is, nevertheless, unable to agree that the provision of the ordinance which excludes from the residential use districts "undertaking business or establishment or funeral home," other than those in existence at the time of the passage of the ordinance, is a lawful exercise of the police power. The fact that the legislative body of the municipality specifically enacted this exclusion is a legislative determination that the particular inhibition would be inconsistent with

the health, security, general welfare, or morals of the munici-
pality; but this conclusion must be sound before it can be
decisive. The governmental power to interfere by zoning
regulations with the general property rights of the land-
owner, by restricting the character of his use, is not arbitrary
nor unlimited. The restriction is void unless it bear a sub-
stantial relation to the lawful exercise of the police power,
because neither the General Assembly of Maryland, nor any
municipality to which it has delegated the power to legislate,
may impose unnecessary and unreasonable restrictions upon
the use of private property. The right of the owner of land
to its lawful use is property within the protection of constitu-
tional law. *Washington, ex rel. Seattle etc. Co. v. Roberge,*
278 U. S. 116, 120, 49 S. Ct. 50, 73 L. Ed. 210, 213. These
principles have been repeatedly affirmed by this tribunal. It
remains to make their application.

The place of business of an undertaker is not a nuisance
*per se.* If it become one by its condition or mode and manner
of operation, redress by those injuriously affected may be had
by way of damages or, under proper circumstances, by relief
in equity. It follows that the art and business of an under-
taker are generally a legitimate pursuit and use of property,
wherever undertaken. Decent preparation of the dead and
their respectful burial is indispensable in a civilized state.

Whatever may be the case with reference to a burial place
or cemetery, it cannot be urged that these preliminary rites
and the sepulture involve any danger to public health, if per-
formed in the usual manner. If proof were necessary of this
·fact, the testimony on this record of an eminent surgeon is
conclusive to this effect. Nor can it be maintained that the
business will, in any appreciable degree, affect the security
or morals of the community. This is so evident that argu-
ment is superfluous. The statute does not include that large
and easy word "comfort" in its declaration of purpose, but
affirms it to be "promoting the health, security, general wel-
fare and morals of the community." So, Code (Supp. 1929),
art. 66B, sec. 1. "Comfort" is not what the Legislature had

in mind, and, consequently, may be dropped from the discussion, and there remain for consideration only the words "general welfare." The adjective is opposed to the particular, and has the meaning of public; and the substantive is comprehensive enough to embrace not only health, security, and morals, but also order, as they are all elements contributing to the public welfare. *Freund on Police Power,* secs. 9, 15; 50 *C. J.,* sec. 96, p. 867. In the able opinion written for this court by Judge Walsh in the appeal of *Tighe v. Osborne,* 149 Md. 349, 356, 357, 131 A. 801, the words "general welfare" were defined, and declared not to enlarge the scope of the police power beyond the reasonable regulations necessary to preserve the public order, health, safety, or morals. The writer is convinced that the restriction has no substantial relation to any of these matters.

The ordinance does not create a district that is exclusively residential. An examination of the zoning map will show that within the residential districts are located and permitted hospitals, churches, and cemeteries. In the neighborhood of the site of the undertaking establishment is a private hospital, and in the next block to the north on the same street is an undertaker's establishment, and three blocks to the south is another. It is true that the places of business of the undertakers were in existence before the adoption of the ordinance; but, nevertheless, they are significant in characterizing the immediate neighborhood, and in supplying concrete evidence that a residential district within the meaning of the ordinance is not one exclusively dedicated to residential uses.

The dead to be cared for in a great city may be the visitors on the street, at a hotel, or in a public place, the patient at a hospital, the permanent guest of a hotel, or the tenant of an apartment, which, for business reasons, does not permit the dead to remain. The undertakers have met the conditions presented by these emergencies, and provided suitable and decent quarters for the dead to await removal, accompanied by religious ceremonies if desired. These places are conducted with privacy, care, and quiet, and without offense to the public. Death comes to most men in their homes, and

there their bodies usually lie until the day of their interment, so it is a normal experience to see the emblem of mourning and funeral cortege in the residential part of the city. To ban the dead, who have no place else to lie, from the comparative quiet and repose of the residential sections and consign their bodies to the commercial districts, is offensive to wholesome instincts and not justified upon the theory that it is necessary. Where all the reticences of death are observed, a normal, reasonable, person is not injuriously affected in health or in mind by the evidence of what must be the universal experience.

The numerous decisions in other jurisdictions, involving the regulation or prohibition of an undertaking business in prescribed sections of a municipality, depend upon particular legislative action, and, while helpful, are not necessarily controlling, as they afford ground for distinction. All, it is submitted, accept as decisive the emotional reaction of a class endowed with sentiment and feeling beyond those of the majority of their fellows in similar circumstances. A mental state induced by entertaining the unpleasant ideas associated with the business of an undertaker, even if accompanied by a resultant depreciation of value of property, does not warrant inhibition of the business in a residential area, within any sound application of the police power of the State and article 66B of the Code (Supp. 1929). See *Pearson & Son v. Bonnie,* 209 Ky. 307, 272 S. W. 375; *Westcott v. Middleton,* 43 N. J. Eq. 478, 11 A. 490; *Koebler v. Pennewell,* 75 Ohio St. 278, 79 N. E. 471; *Dean v. Powell Undertaking Co.,* 55 Cal. App. 545, 203 P. 1015; 2 *Dillon on Municipal Corporations,* sec. 683. Stabilization of subsisting values may be an anticipated circumstance which will accompany zoning, but it is not a condition of its exercise. In the instant case, the prohibition gives an artificial monopolistic value to properties now used for the undertaking business, by preventing any competition arising within the districts classified as residential.